582 So.2d 377 (1991)
MISSISSIPPI BOARD OF BAR ADMISSIONS
v.
APPLICANT F.
No. 90-CA-0130.
Supreme Court of Mississippi.
March 27, 1991.
Rehearing Denied May 29, 1991.
Mike C. Moore, Atty. Gen., Craig E. Brasfield, Sp. Asst. Atty. Gen., Jackson, for appellant.
Samac S. Richardson, Brandon, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
Today's appellant failed the Mississippi Bar Examination. He claims he has been treated unfairly and presents important questions concerning the administration of the examination and, more particularly, regarding the scope of judicial review of the Mississippi Board of Bar Admissions' final grading decisions. The Chancery Court considered the matter and granted relief.
We have reviewed the matter and find nothing in the action the Board took with respect to appellant's examination answers which may be fairly characterized as arbitrary, capricious or malicious. We reverse and reinstate the order of the Board.

II.
Applicant F is an adult resident citizen of Rankin County, Mississippi. In February of 1989, Applicant F sat for the Mississippi Bar Examination (hereinafter "the bar exam").
The Mississippi Board of Bar Admissions (hereinafter "the Board") is a political creature of the state. The Board has nine members who are members in good standing of the Mississippi State Bar. The members serve under appointment of the Justices of this Court. Miss. Code Ann. § 73-3-2 (1989 Recompiled). We have conferred *378 upon the Board the power to promulgate the necessary rules for the administration of their duties, subject to the approval of the Chief Justice.
The Board has a carefully drawn procedure for grading the examinations and initially assigned Applicant F a net grade of 68, two points below the minimum score of 70 required for admission. Board rules rendered Applicant F eligible for an automatic re-grade, and, upon completion of this process, Applicant F's overall score was adjusted to 69.3, still below the required score of 70. Applicant F was notified that he did not pass the bar exam.
Applicant F timely filed with the Board a petition for review, see Rule XI,[1] Rules Governing Admission To The Mississippi State Bar (1979, as amended). In his petition, Applicant F attacked the grading of his examination in three areas: (1) wills and estates, (2) domestic relations, and (3) workers' compensation. On June 23, 1989, the Board denied Applicant F's petition, certifying once again that his examination answers failed to yield a passing score.
On October 4, 1989, Applicant F commenced the present proceedings for judicial review by filing in the Chancery Court of Rankin County, Mississippi, a petition he mislabeled "Complaint."[2] Rule XII, § 1. On November 21, 1989, the Chancery Court released an opinion purportedly relying upon Rule XII, § 2, holding that the Board's denial of Applicant F's petition for review was "arbitrary or capricious in the three specified areas," to-wit: wills and estates, domestic relations, and workers' compensation. On December 7, 1989, the Chancery Court ordered that the Board immediately issue to Applicant F a proper certificate of admission which would in turn render him eligible for admission to the practice of law in the State of Mississippi upon presentation of petition to Chancery Court.
The Board filed timely notice of appeal to this Court, and we stayed the Chancery Court's order pending our review.

III.
The Constitution has established this Court as the highest court of this state and has vested in it judicial power, Miss. Const. Art. 6, § 144 (1890). The Constitution thus vests in this Court authority to regulate the professional behavior of those officers of the Court commonly called lawyers. We have repeatedly recognized this inherent constitutional power in the context of proceedings for the discipline, suspension and ultimately disbarment of lawyers. Mississippi State Bar v. Phillips, 385 So.2d 943, 944 (Miss. 1980); Matter of Mississippi State Bar, 361 So.2d 503, 505 (Miss. 1978). It is far too late to question that this authority exists independent of statute. See, e.g., In re Fox, 296 So.2d 701, 702-04 (Miss. 1974); Ex Parte Cashin, 128 Miss. 224, 232-34, 90 So. 850, 851-52 (Miss. 1922). All have consistently regarded statutory supplementation to enhance, not limit, the Court's constitutional powers. Levi v. Mississippi State Bar, 436 So.2d 781, 783 (Miss. 1983).
As this Court has power to adjudge fitness of persons to practice law through disciplinary processes, it follows on principle that we may address unfitness on the front end, at the time the individual applies for admission to practice. This state's legislature has recognized this constitutional power in its unequivocal declaration that

*379 The power to admit persons to practice as attorney in the courts of this state is vested exclusively in the Supreme Court of Mississippi.
Miss. Code Ann. § 73-3-2 (1989, Recompiled). We implemented that power on November 26, 1979, with our order adopting the Rules Governing Admission To The Mississippi State Bar, rules which have been supplemented and amended from time to time thereafter.
It is true that we have no statute or rule expressly providing for an appeal such as the Board takes from the Chancery Court's order of December 7, 1989. This has been a concern in the past, in other contexts and stages of procedures for disbarment, but we have never regarded it an impediment to judicial exercise of the constitutional power and responsibility to regulate the lawyers appearing before the courts. See Ex Parte Cashin, 128 Miss. 224, 232, 90 So. 850, 851 (1922). If additional authority were needed  which it is not  we need only refer to the statute which vests in this Court authority to
... hear and determine all manner of pleas, plaints, motions, causes, and controversies, civil and criminal ... which may be brought before it, and which shall be cognizable in said court; ... .
Miss. Code Ann. § 9-3-9 (Supp. 1990). This Court's rules serve as the procedural vehicle for appeals such as this, and we might add from our review of the record that the parties seem to have traversed these without inordinate difficulty. See Miss.Sup.Ct. Rules (1988).

IV.
A word on our scope of review. Our function this day is like that of a licensing agency. In the context of the regulatory boards and admitting authorities with respect to other professions, relief on judicial review is limited to those instances where the authorities have acted arbitrarily and capriciously. See, e.g., State Board of Psychological Examiners v. Coxe, 355 So.2d 669, 671 (Miss. 1978). In the case of lawyers, and particularly in the context of discipline and disbarment proceedings, we have  by way of contrast  exercised our constitutional powers through a regimen of de novo review, holding that we sit as the finders of the facts and proceeding ab initio. See, e.g., Goeldner v. Mississippi State Bar Ass'n, 525 So.2d 403 (Miss. 1988); Foote v. Mississippi State Bar Ass'n, 517 So.2d 561 (Miss. 1987); Myers v. Mississippi State Bar, 480 So.2d 1080 (Miss. 1985).
In the bar admissions process, we have chosen to exercise our constitutional authority in a different way. We have delegated the examination process to the Board of Bar Admissions. We have provided applicants aggrieved by Board action the procedural vehicle of a petition for review before the Chancery Court of his county. In Rule XII, § 2, we have directed that
... the Chancery Court shall not regrade the examination or substitute its judgment of the merits of the applicant's examination for the decision of the Board.
We followed this directive with a declaration that the Chancery Court may reverse the Board's decision only if it finds that the Board's refusal to certify the applicant as having passed the Bar examination "was arbitrary, capricious or malicious"  the familiar standard used in judicial review of other administrative licensing decisions in this state. Melody Manor Convalescent Center v. Mississippi State Department of Health, 546 So.2d 972, 974 (Miss. 1989); Mainstream Savings & Loan Ass'n v. Washington Federal Savings and Loan Ass'n., 325 So.2d 902, 903 (Miss. 1976).
Of course, our review of the action of the Chancery Court is de novo. When we say this, we accept the same limitation upon our own review of Board action. That there be no doubt hereafter, this Court will vacate or modify the Board's bar exam grading decision only where we find it "arbitrary, capricious or malicious." This standard is inherently general and open-textured and does not admit of precise application. In the present context In re Mead, 361 N.E.2d 403, 405 (Mass. 1977) holds that a complaining examinee must offer more than "bald *380 conclusory language in support of his claim." The Mead Court emphasized the broad discretionary powers of the Board in dismissing the claim. Id. Most of the other published decisions on this issue indicate that some degree of subjectivity is allowed in the grading of essay questions. See, Hooban v. Board of Governors of Washington State Bar Ass'n, 85 Wash.2d 774, 539 P.2d 686, 689 (1975).

V.
The bar admission process in this state serves the public interest by examining applicants through a testing procedure which is at once clear and fair to the applicants. Applicants are told in advance what materials they can and should bring to the testing site. They are also furnished detailed advance information regarding the grading process, including a sample grade sheet to show how the examination will be graded.
The examination has three component parts: (1) the State essay examination,[3] consisting of nine essay examinations, each prepared and graded by one of the nine members of the Board. This portion of the examination, which emphasizes Mississippi law and procedure, is weighted at 40% of the total scores. (2) The Multi-state Essay Examination (MEE) consists of six questions, prepared by the National Conference of Bar Examiners and is graded by the Board under Uniform National Grading Standards. The MEE is weighted at 20% of the total score. (3) The Multi-state Bar Examination (MBE) is a 200 question objective format examination covering six subjects (contracts, torts, criminal law, constitutional law, real property, and evidence). The MBE is prepared by the National Conference of Bar Examiners and is administered and given under the auspices of American College Testing Service. The MBE is weighted at 40% of the total score.
Prior to the state essay examination, the members of the Board exchange their proposed questions and grading analyses. At least two Board members review each such question before it is administered.
Following the examination, each examination answer booklet is coded and the grading process begins. The entire grading and regrading process, including any petitions for review, is conducted in anonymity; that is, examiners and/or graders do not know the identity of the person whose answer they are grading. Once all state essay examinations have been graded, the examination scores are integrated with scores on the subjective MEE examination and the objective MBE examination. All scores are adjusted statistically to insure consistency between different administrations. This process of adjusting insures that a score of 70.0 on each administration is equivalent to a score of 70.0 on the average of the six most recent Mississippi Bar Examinations.
There is an automatic regrading process for marginal failures. All essay examinations of applicants initially scoring between 68.0 and 69.9 are regraded by another member of the Board, who had been involved in the review of the questions at the pre-examination stage. This is done before any scores are released. As an example, the examiner responsible for the torts essay question on a particular examination may have as his "swap partner" the examiner responsible for the contracts essay question on the same examination. These partners review each other's examination questions prior to the examination for clarity, fairness and appropriateness. Likewise, when an applicant falls in the automatic regrade category, the "swap partners" exchange the essay examination answer written so the applicant's examination is regraded by an examiner different from the one who initially graded his examination. This regrading process is done on a "blind" basis, where the second grader is not aware of the initial grade. If the regrader awards a higher score than the initial grader, the applicant receives the average of the two grades. If the regrader awards a lower grade, the initial score on that examination is taken as the final grade. This procedure insures that this *381 "borderline reappraisal" can only benefit the applicant.
The grading process takes approximately thirty days, after which all scores are compiled and calculated by computer to determine an applicant's final score. Only after all grading is completed are the applicants' code numbers matched with their applicant numbers and the identities of the passing and failing applicants determined. All failing applicants are furnished with a detailed report of their performance on all parts of the examination. After results are released, unsuccessful applicants then have a period of thirty days in which they can request copies of questions of their answers and the analyses that were used in grading the essay examinations.
Prior to each Bar examination, the Board Chairman appoints a Review Committee of not less than three members of the Board. That three-member Review Committee receives all petitions for review, such as that Applicant F has filed. The identities of the petitioners are not known to the Review Committee. Each member of the Review Committee reviews each question that the applicant contends was substantially misgraded. The Review Committee's standard of review is controlled by Rule XI, § 4, to-wit: is there any clear and manifest evidence that applicants' papers were substantially misgraded to an extent that the examination result as a whole may be affected. The Review Committee determines if the examiner preparing that particular examination question made some clear error of law and the applicant's response may be correct or that the model answer may possibly be wrong. It is not the function of the Review Committee to determine a small point increase or decrease in the applicant's score; rather, the Review Committee determines if there is manifest error in the grading.

VI.
Applicant F sat for the Mississippi Bar examination in February, 1989. He achieved a score of 134 on the MBE portion of the Bar exam, which converted to a score of 71.5 on a 0 to 100 point range. On the MEE portion of the Bar exam, he achieved a score of 70.0. On the Mississippi essay portion of the Bar exam, Applicant F's score was 67.9. These final essay scores were scaled and resulted in Applicant F's overall score of 69.3. These final essay scores were the result of the regrade. Applicant F's initial score was 68.0, which placed him in the range for an automatic regrade of all his essay examinations. Pursuant to Board procedures, an applicant whose combined score falls in the automatic regrade category can never be given a score less than his initial score following the regrade.
We have examined Applicant F's score sheets, both pre- and post-regrade. It is noteworthy that Applicant F received 45 points on his Mississippi essay question on Wills and Estates and Domestic Relations on the initial grading by the examiner. The examiner who regraded Applicant F's Wills and Estates and Domestic Relations answer gave him only 24 points! As stated above, Board rules prohibited awarding Applicant F a lower score on regrade than on the initial grade. Applicant F thus retained his score of 45 points even after a regrade. Also noteworthy are Applicant F's scores on Torts and Evidence/Discovery essay questions, which, on the regrade, resulted in a substantial decrease in his score. Again, due to the Board's policy, Applicant F retained his original higher score on these essay questions.
When his Workers' Compensation question was regraded, Applicant F gained an additional single point, moving from 60 to 61 points. When an applicant's examination is regraded and he is awarded more points on the regrade than the original score, then the regraded score and the original score are averaged to produce the score awarded to the applicant. When his original grade of 60 and his regrade score of 61 are averaged, the result is 60.5, which was rounded up by the Board, resulting in a regraded score of 61. When examined in this light, it can only be said that the Board of Bar Admissions has been exceedingly fair not only to Applicant F, but to all *382 applicants whose scores fall in the automatic regrade category.

VII.

A.
Applicant F's principal challenge is that the examiners failed to provide adequate instructions regarding the examination, and that this fact, coupled with the questions themselves, substantially misled him. Of importance, we find among the general instructions given all applicants:
Each answer should show an understanding of the facts, a recognition of the issues involved, the principles of law applicable and the reasoning employed to reach the conclusion. Questions are intended to be inquiries on fundamental points of law on each subject. Do not search for hidden meanings, "catches" or remote exceptions since none are intended.
Applicant F's answers largely ignored these general instructions, as will presently be apparent.

B.
Applicant F argues that, with respect to the Wills and Estates section, the Board's action in grading his answer and in denying his petition for review was arbitrary and capricious. The Chancery Court conclusorily so found.
The question is one loosely drawn from the facts and circumstances of this Court's decision In re Will and Estate of Vavaris, 477 So.2d 273 (Miss. 1985). The facts situation begins with
Raphael Gabrielle, a resident of Jackson, originally from Verona, Italy, makes a will in 1973 ...
Gabrielle is also assumed to own property in Italy. Applicant F argues that this reference to nationality was misleading and that it should not have been included in the question. The point escapes us. The questions and instructions make clear that an original will was made in Mississippi. The examinee is asked to decide whether a second will, also made in Mississippi, should be admitted to probate. We do not see how any competent examinee could be misled by Gabrielle's Italian connection.
The question rather obviously calls for a discussion of the problem of undue influence in procuring a testator's will. The fact that a son was deeply involved in the making of the latter will which left him virtually all of the testator's estate should have been sufficient to have put any applicant on notice that the presumption arising from a confidential relationship should have been discussed. Applicant F failed to spot the problems inherent with the legatee's lawyer drawing the will and with the legatee's wife witnessing the will in the law office. Applicant F's cursory answer is "the issue of undue influence could be raised, but there seems to be none... ." Examination instructions direct that the examinee discuss "the principles of law applicable and the reasoning employed to reach a conclusion." Suffice it to say that Applicant F's answer does not even come close to doing this.
There are other errors in Applicant F's answer. He writes that, if the first will were allowed to remain in effect, the two sons would be entitled to:
... elect outside the Will and take a share in proportion, as if there were no Will at all in this case each son would take a 1/2 interest in the estate.
This is patently incorrect. Apparently, Applicant F confused the right of a spouse to elect against the will. Children have no such right of election, and the children would have taken according to its terms.
Next, Applicant F, after discussing the requirements for executing a valid will, states that since the first will was not revoked by physical act, and the second will did not say that it revoked the first will, "the two Wills would be read together," completely ignoring the obvious fact that the terms of the second will were completely inconsistent with the terms of the first will and, therefore, revoked it by implication if not expressly.
We find nothing arbitrary and capricious in the Board's judgment that Applicant F did not pass the Wills and Estate section of the examination.

*383 C.
Applicant F challenges the grading of his answer to the Domestic Relations question. The first part concerns an irreconcilable difference divorce in which the wife was not represented by an attorney but relied on her husband's attorney. The question asks for a discussion of the wife's remedies where the husband breached the court-approved property settlement agreement. The question rather obviously calls for a discussion of the wife's remedies against the husband by reason of his arguably fraudulent conduct. Applicant F has little to say about this but instead talks of the wife suing the husband's attorney for legal malpractice. Applicant F's answer mentions a motion filed with the Chancery Court to modify, without a discussion of underlying reasons, and then lapses into an enumeration of the thirteen grounds for divorce in Mississippi, which clearly have nothing to do with the question.
Even if Applicant F were given most of the 25 points allowed on the first part of the Domestic Relations question, he almost completely misses the boat on the second part, where the issue of jurisdiction under the Uniform Child Custody Jurisdiction Act is prominent. Applicant F shows familiarity only with the name of the UCCJA, as he states that the husband, who lives in the state which granted the divorce, can "obtain some help in getting a hearing and some visitation" from the Act, when under the facts of the question, the wife, living in Florida, is the one making use of the Act. See Walker v. Luckey, 474 So.2d 608 (Miss. 1985). He fails to state that under the Act, the state that is the home state of the child has jurisdiction to make child custody determination. In addition, Applicant F omits any discussion of the procedure required by the Act, the principal one being that the two courts, upon being informed that litigation is proceeding in the other, are required to communicate with one another to ascertain the more appropriate forum.
He also states that the wife is in contempt of court and must go into the jurisdiction where she obtained her divorce to get a modification, thus ignoring the fact that she was proceeding under the Act as the only possible vehicle for litigating custody in a foreign jurisdiction. The Domestic Relations question was not substantially misgraded; rather, it was substantially "mis-answered." There is nothing arbitrary or capricious in the Board's decision that Applicant F flunked Domestic Relations.

D.
Applicant F finally challenges the Workers' Compensation portion of the examination. Applicant F claims that his troubles with the question were a result of a lack of specific instructions. While a simple reading of the instructions on the question bears this assertion false, it should also be noted that Applicant F actually successfully identified five of the six major issue groups in the question. He failed to discuss "the principles of law applicable and the reasoning employed to reach the conclusion." Applicant F simply answered the question poorly, suggesting lack of grasp of the subject matter. We find no arbitrariness nor caprice attending the Board's decision.

VIII.
Inherent in Applicant F's appeal is an attack upon the subjectivity of the grading process. Such challenges have been made in other states and repeatedly rejected. See, e.g., Dinger v. State Bar Board, 312 N.W.2d 15 (N.D. 1981); Whitfield v. Illinois Board of Law Examiners, 504 F.2d 474 (7th Cir.1974); McGinn v. State Bar Board, 399 N.W.2d 864 (N.D. 1987). Tyler v. Vickery, 517 F.2d 1089 (5th Cir.1975), is a most cited case concerning essay type bar examination questions. In Tyler the Court of Appeals stated
The relevant question must then be whether the passing of an examination made up of subjective, essay-type questions has a rational connection with the applicant's ability to practice law in the State of Georgia. It is beyond question that it does. While a Plaintiff would apparently favor a more objective type of examination, much of an attorney's actual *384 work once admitted into practice involves the analysis of complicated fact situations and the application thereto of abstract legal principles. Both in legal practice and with these essay-type questions, recognition of the legal problem presented and well-reasoned explication of the relevant considerations is of utmost importance.
Tyler, 517 F.2d at 1102.
The Court of Appeals also went on to defend a regrading procedure similar to that used in Mississippi and held:
Indeed, it is curious logic to condemn the examiners for utilizing practices designed to recognize the inherent limitations of testing and for attempting to give the benefit of the doubt to applicants who may have been adversely affected by those limitations. Similarly, we see no infirmity in the fact that the standards for determining which papers are to be regraded are not fixed and immutable and may depend in part upon the exercise of an examiner's discretion.
Tyler, 517 F.2d at 1103.
Implicit in Applicant F's appeal to the Chancery Court and in his pleadings filed in this Court is the idea that the courts should regrade his essay examinations  or at least the ones on which he received low grades. The examiners charged with this responsibility are appointed by Justices of this Court. These examiners are distinguished attorneys who are recognized by this Court for their ability and judgment in Bar examinations. Their duties have been summarized by the Supreme Court of Georgia in Ex Parte Ross, 197 Ga. 257, 28 S.E.2d 925 (1944), holding that the Board of Bar Examiners is the exclusive judge of the matter of grading Bar examination papers, and stating:
The Bar examiners are chosen because of their high character, knowledge of the law, and experience in the practice of the law, and they are made sole and exclusive judges of the matter of grading Bar examination papers.
This Court has nine competent, professionally dedicated lawyers to serve on the Mississippi Board of Bar Admissions. We decline Applicant F's invitation that we usurp their duties and responsibilities by regrading his examination. We find nothing in the process by which Applicant F has been examined that is arbitrary, capricious or malicious, nor in the Board's consideration of and denial of his petition for review.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., and PRATHER and SULLIVAN, JJ., concur.
HAWKINS, P.J., dissents with written opinion with DAN M. LEE, P.J., concurring in results only.
PITTMAN, J., dissents without written opinion.
BANKS and McRAE, JJ., not participating.
HAWKINS, Presiding Justice, dissenting:
I respectfully dissent.
I would have no quarrel with the majority view if this case were properly before us on the merits. I am familiar with this record, the examination given Applicant F, and his answers.
My problem with the majority is that there is no statute or rule of this Court, none, giving this Court the authority to hear this appeal. We do not have jurisdiction, and should concede this.
Effective November 1, 1979, this Court adopted the Rules Governing Admission to the Mississippi State Bar (BR). Contrary to many other rules which have proliferated out of this Court, these Rules are specifically authorized by statute. Miss. Code Ann. § 73-3-2(1) states:
(1) Power to Admit Persons to Practice. The power to admit persons to practice as attorneys in the courts of this state is vested exclusively in the Supreme Court of Mississippi. (Emphasis added)
Therefore, I have no question in this case but that this Court is lawfully empowered to promulgate all rules pertaining to bar admission. There have been cases where I have questioned this Court's rule-making *385 assertions, Hall v. State, 539 So.2d 1338, 1348 (Miss. 1989) (Hawkins, P.J., dissenting); City of Mound Bayou v. Johnson, 562 So.2d 1212, 1220 (Miss. 1990) (Hawkins, P.J., dissenting); but no such questions can be raised as to our rule-making power dealing with bar admissions.
Rule XII of the Bar Rules states in full:
RULE XII. APPEAL FROM BOARD'S FINAL DETERMINATION
Section 1. Right to Appeal
A failing applicant who has filed a Petition for Review as provided in Rule XI shall have the right to appeal from the order of the Board denying his Petition to the Chancery Court of the county of his residence within six (6) months of receipt of notice of such order. (Emphasis added)
Section 2. Standard of Review
The grounds of appeal shall be limited to those specified in the applicant's Petition for Review before the Board. The Chancery Court shall not regrade the examination or substitute its judgment of the merits of the applicant's examination for the decision of the Board. The Board's decision to fail an applicant shall be reversed by the Chancery Court only if the applicant proves by a preponderance of the evidence that the Board's denial of his Petition was arbitrary, capricious or malicious.
Section 3. Record on Appeal
The Board must within thirty (30) days after the applicant's appeal is filed in Chancery Court or within such further time as the court may grant, file with the Court and serve upon the applicant an answer. The Board shall therewith forward to the Court applicant's Petition together with copies of examination questions (excluding the MBE), model answers or other analyses used in grading the examination, and the original of applicant's answers.
This is the only rule dealing with any appeal from the Bar Board's decision. Clearly, the only appeal authorized by Rule XII is an appeal by a failing applicant to the chancery court of the county of his residence.
Beyond this, is there any statute governing appeals from a Bar Admission Board's decision? The final sentence of Miss. Code Ann. § 73-3-2(6) states:
The applicant shall have the right to appeal from this order (denying him admission to bar) to the chancery court of the county of his residence within six (6) months of receipt of notice of such order.
The chancery court proceeding in this case was a "judicial review of an administrative action. The chancery court was sitting as an appellate court." (Majority Opinion, p. 378, footnote 2) This case in turn is before us as an appellate review of the chancellor's decision. (Majority Opinion, p. 378)
Until the last few years, appeals to this Court could only be authorized by statute. Sanford v. Bd. Supervisors, Covington Co., 421 So.2d 488, 490-491 (Miss. 1982). Even now, at least until the majority just spoke in this case, there could be no appeal to this Court unless authorized by a statute or rule of this Court, or both. See authorities cited in City of Mound Bayou v. Johnson, 562 So.2d at 1220. We are an appellate court. This case is before us on an appeal from an appellate decision by a chancery court. The only possible way we can have authority to hear this appeal is for some statute, or at the very least, some rule of this Court to authorize it. And there is none.
My problem with the majority is that by hocus-pocus verbiage, a mixing of apples and oranges, it treats our indisputable authority to admit, disbar or discipline attorneys in the practice of law as an authority to hear this case on this particular appeal. Now, the majority might wish we had the authority, and it might be well and good if we had made provision by rule for appeal to this Court. Unfortunately for the majority there is no such rule or statute authorizing this appeal by the Bar Admission Board from the chancery court.
The majority tells us that we have the authority to address the unfitness of a person to practice law at the front end. No *386 one disputes that, or that the power has been vested by the Legislature exclusively in this Court. This is not the question. The question here is our authority to hear this appeal.
The only authority the majority cites to hear this appeal cannot survive the must cursory of examinations. Ex Parte Cashin, 128 Miss. 224, 232, 90 So. 850, 851 (1922), is simply authority for the proposition that a court of general jurisdiction in this State has authority to proceed by original jurisdiction to discipline or disbar an attorney. Indeed, this Court has held it, too, has original jurisdiction to discipline or disbar an attorney. In re Marshall, 160 Miss. 874, 134 So. 67 (1931). All lawyers' professional fitness and professional conduct are proper subjects for investigation by this Court. If this Court saw fit to take some action relative to Applicant F's qualification to practice law, it has the unquestionable authority to do so. This is not the question. The question is our authority to hear this particular appeal, and there is none. The majority grabs it out of thin air.
The remaining authority the majority cites is Miss. Code Ann. § 9-3-9 (Supp. 1990). The majority fails to quote the entire paragraph:
§ 9-3-9. Jurisdiction of the court.

The supreme court shall have such jurisdiction as properly belongs to a court of appeals, and shall hear and determine all manner of pleas, plaints, motions, causes, and controversies, civil and criminal, which are now pending therein, or which may be brought before it, and which shall be cognizable in said court; but a cause shall not be removed into said court until after final judgment in the court below, except in cases particularly provided for by law; and the supreme court may grant new trials and correct errors of the circuit court in granting or refusing the same. (Emphasis added)
Provided, however, the supreme court shall have such original and appellate jurisdiction as may be otherwise provided by law in cases and proceedings for modification of any rates charged or sought to be charged to the public by any public utility.
First, the statute only gives this Court such jurisdiction "as properly belongs to a court of appeals." Second, we can only hear cases which are "cognizable" in this Court, i.e., cases in which we have lawful jurisdiction. For the majority to assert that this case is "cognizable" before us on this appeal begs the very question. Is it indeed? Of course, with no checks or balances whatever, if the majority chooses to say so, then that makes it so. And the majority says so.
Finally, the statute says we will only hear appeals "particularly provided for by law." The majority creates a singularity of marvelous proportion in asserting this statute grants unto us authority to hear this appeal. In sum, though the majority may assail us with sophistry, the frozen truth remains that the only authority the majority has to hear this appeal  like Lamb's Dream Children  exists only in the heads of the majority.
In fact, I do not know why the majority does not go ahead and simply say that because we have authority to admit lawyers to practice and to discipline them, ipso facto, we have the inherent power to hear this appeal. It would be wrong, but at least it would be straightforward. Spare us the additional assault upon our intelligence.
The majority makes its own rules as we go along.
I have a simple hang-up that we should honor established precedent, the statutes and our rules.
DAN M. LEE, P.J., concurs in result only.
NOTES
[1] Unless otherwise indicated, hereafter all references to provisions of the Rules Governing Admission To The Mississippi State Bar will simply be referred to as "Rule ____."
[2] Inexplicably, Applicant F's principal argument in his brief on this appeal is that the Board has "confessed" the allegations of his "complaint." Applicant F appears of the impression that his action in the Chancery Court of Rankin County was an original civil action subject to the Mississippi Rules of Civil Procedure. Because the Board did not file an answer, under Rule 8(2)(d), Miss.R.Civ.P., Applicant F says his complaint should be taken as admitted. To be sure, the Chancery Court had subject matter jurisdiction of Applicant F's claim. Gill v. Mississippi Department of Wildlife Conservation, 574 So.2d 586, 590 (Miss. 1990). Applicant F's application, however, was in the nature of a petition for judicial review of an administration action. The Chancery Court was sitting as an appellate court. The Board's failure to file a Rule 8 answer was of no moment.
[3] Applicant F's complaint goes only to this part of the bar exam.