659 So.2d 561 (1995)
Djuna WATKINS, Regina Irvin and ReJohnna Mitchell
v.
MISSISSIPPI BOARD OF BAR ADMISSIONS.
MISSISSIPPI BOARD OF BAR ADMISSIONS
v.
Lynda TILLIS and Josie Mayfield.
No. 92-CA-01229-SCT.
Supreme Court of Mississippi.
June 29, 1995.
As Corrected August 3, 1995.
*564 Barry W. Howard, Chokwe Lumumba, Jackson, for appellants.
Michael C. Moore, Atty. Gen., James F. Steel, Deputy Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and BANKS and JAMES L. ROBERTS, Jr., JJ.
BANKS, Justice, for the Court:
This case arises because the Mississippi Board of Bar Admissions (Board) seized upon a vacuum in its rules, abandoned a long held policy and leaped into a quagmire. The applicants now before the Court claim that the decisions of the Board were motivated by race or had a disparate racial impact or were no more justified than other twists of the rules which would benefit them, and were, thus, arbitrary and capricious. After careful examination, we conclude that the procedure utilized by the Board and the distinctions drawn have a rational basis such that they cannot be deemed arbitrary or capricious. We further conclude that there was a failure of proof that the procedures in question were motivated by race or administered in a discriminatory manner. It follows that we affirm the judgment of the circuit court denying relief to certain examinees and reverse and render the judgment granting relief to other examinees.

I.
This is an appeal by Djuna Watkins (Watkins), Regina Irvin (Irvin), and ReJohnna Mitchell (Mitchell) of the chancery court's ruling denying them admission to the bar in their action against the Board. By cross-appeal, the Board seeks review and reversal of the chancery court's ruling granting Lynda Tillis (Tillis) and Josie Mayfield (Mayfield) admittance to the bar.
On February 21, 1992, Irvin, Watkins, and Tillis filed an appeal with the Chancery Court of the First Judicial District of Hinds County from a February 6, 1992 decision of the Board denying them permission to transfer essay scores obtained on previous bar exams to subsequent exams. An amended appeal was filed with the chancery court on April 15, 1992 naming ReJohnna Mitchell as an additional appellant. On May 15, 1992, Josie Mayfield filed a Motion To Intervene as an additional appellant; this motion was granted on May 21, 1992. (Hereinafter, the petitioners will be referred to as "examinees".)
On April 29, 1992, arguments were heard before the chancery court. The Board objected to the court's allowing live testimony in reviewing the Board's decision. It argued that the proceedings should be an appeal on the record previously made before the Board, and that there is no provision in the rules providing for a trial de novo or the taking of evidence. The court overruled the objection and proceeded to hear testimony. For the most part, the facts are undisputed. Mississippi has a dual passing requirement under State Bar Rule IX(9)(D)(2). The bar consists of two-thirds essay  a portion being state essay, and a portion being multi-state essay. The essay portions are weighted as 60% of the overall exam. Applicants must also take a multi-state multiple choice exam which is weighted as 40% of the overall exam. They must achieve an overall combined score of 70.0 or higher on the exam to pass.[1]
Formally adopted bar admissions rules can only be changed by way of petition to the Supreme Court. Although there was no formal rule stating that applicants may transfer essay scores, the Board, for the first time, approved essay transfers for eight applicants at a January 18, 1991 Board meeting. This action came in response to a petition filed by seven applicants who alleged a violation of the rights to equal protection. They had achieved scores of 70.0 or above on the July 1990 essay portion of the examination which *565 was within 20 months of the February 1991 exam. These applicants argued to the Board that it was unfair to allow examinees achieving a minimum score on the multiple choice type Multi-State Examination to transfer scores, while they were not allowed to transfer passing scores on the essay portion of the examination. One of the seven petitioning applicants was black and the rest were white.
The Board found this claim to be "intellectually and legally" defensible and proceeded to investigate the possibility of addressing the problem. After investigation, the Board proposed to allow a one time transfer of essay scores and thereafter, with the approval of this Court, achieve equality by eliminating all transfers, essay and multi-state. The Board adopted a resolution to this effect in its meeting of January 18, 1991.
The Board assumed authority to transfer essay scores pursuant to Rule IX Section 1 of the Rules Governing Admission to the Mississippi Bar which provides that examinees shall be required to take and pass a written bar examination "in a manner satisfactory to the Board... ." In determining adequate performance under the rule, the Board assumed the discretion to allow transfers of scores, and to set as a minimum for transfer a raw score of 70.0 obtained within the last three examinations (20 months). This 20-month period was the same as that applied to the transfer of MBE scores by formal rule.
In order to give all similarly situated the benefit of this action, the Board directed that its files be reviewed to determine others who had received an essay raw score above 70.0 on the three preceding examinations, July 1990, February 1990 and July 1989. One additional applicant was identified and the Board ordered that the original seven and this one identified person be allowed to transfer essay scores to the February 1991 examination.
In February, 1991 three black applicants, including Josie Mayfield, petitioned the Board to transfer their essay scores to the February, 1991 exam. Thereafter, on April 9, 1991 the Board filed a petition with this Court in accordance with the determinations made in the January meeting, seeking the elimination of transfers of scores and the reduction of the minimum MBE score from 126 to 120. At its April 15, 1991 meeting, the Board formally denied the petitions of the three black applicants for the stated reason that the essay scores requested to be transferred were obtained on examinations prior to July 1989, and therefore outside the 20 month period.
On October 16, 1991, in response to the Board's petition, the Supreme Court lowered the minimum MBE score from 126 to 120. On February 6, 1992, the Supreme Court entered an order which eliminated the further transfer of essay scores. The transfer of MBE scores was not prohibited.
In the meantime, three applicants, including Senator Amy Tuck Powell, filed petitions alleging that they had obtained transferable scores on the essay exam on the July 1990 examination or later and that they were not notified prior to the February 1991 examination of their right to take it. This petition precipitated an additional search of the files and one other applicant was determined to fit in that category. Additionally, three applicants who took the February 1991 examination achieved scores in excess of 70.0 on the essay portion of the examination but failed the overall examination. The Board allowed these seven to transfer essay scores to the July 1991 examination. Powell's essay score subject to transfer was obtained on the July 1989 examination. This score was procured within 20 months of the February 1991 exam, but not procured within 20 months from the July 1991 exam. She was allowed to transfer the grade nevertheless because she was among the four who should have gotten notice of the opportunity to transfer prior to the February examination but did not.
In comparison with Powell and others, Jerome Hafter, chair of the Board, examined the scores of each examinee individually and testified as to why they were not allowed to transfer their essay scores.
Mayfield achieved a raw essay score of 70.3 (74.9 scaled) on her February, 1989 exam. She petitioned to transfer that score to her February 1991 exam and also filed a November 1991 petition to be admitted to the bar. Both were denied because her score *566 was not obtained within the 20 month time frame. Watkins petitioned to transfer her July 1991 essay score of 67.9 to the February 1992 exam. She was denied because her score was below the 70.0 threshold requirement. Irvin petitioned to transfer her February 1990 raw score of 63.6 to the February 1992 exam. She was denied because her score was under 70, and she sought to transfer a score more than 20 months old.
Tillis petitioned to transfer a raw score of 69 from her February 1989 exam to February 1991. She was denied because her score was below 70. Mitchell took the bar three times. In February 1989 she received a score of 70.3. In July 1990 she received a score of 58.6, and in July 1991 she received a score of 61.4. Her petition to transfer her February 1989 score was denied because it did not fall within the period allowed for transfers. Her July 1990 and 1991 scores were not transferred because she did not receive a score of 70 or above.
Mitchell took exception to Hafter's allegation that she did not receive a passing score. She testified that she wished to transfer her July 1990 MBE score of 124, and wished to combine parts of her July 1990 and July 1991 essay scores in order to achieve an overall passing score. The Board has never allowed partial scores from different exams to be combined and declined to do so here.
Because racial discrimination was alleged here, there was evidence of the treatment of other black applicants with respect to the transfer of essay scores. Hafter testified that Brenda Mitchell, not an appellant here, petitioned to transfer her July 1991 raw score of 76.5 to the February 1992 exam. Mitchell would have been allowed to transfer her essay score, however the Supreme Court's February 6, 1992 order prohibiting the transfer of essay scores, in effect, reversed the Board's decision allowing her to transfer her score. The decision to allow her to transfer her grades was never formally transmitted to Ms. Mitchell, however, causing her concern and consternation. She is not a petitioner here because she took the entire February exam and passed.
The circumstances of Theresa Hearns-Haynes were also delved into. It appears that Ms. Haynes achieved an MBE score of 117 at an examination given in 1987, when the minimum for passage was 117. The subsequent examination required a minimum of 120. Her first effort was to secure a ruling that her 117 was sufficient to transfer and be considered a minimum score for the subsequent examination. The Board reasoned that while the score was sufficient for transfer under the old minimum, it was insufficient for passing under the new minimum and, therefore, to allow the transfer would result in automatic failure. Haynes also inquired about the possibility of transferring her essay examination results which were above 70.0, and was informed, truthfully at that time, that that had never been allowed. There is no indication that there was a formal petition filed by Haynes challenging the practice on equal protection grounds or any other grounds.
Hafter testified that the Board has never transferred an essay score less than 70 nor has the Board ever allowed transfer of an MBE score more than 20 months old. In addition, the Board has not transferred any scores since the Supreme Court's February 6, 1992 order.
The chancery court found that Tillis met the requirements necessary to pass the bar. It noted that she received a February, 1989 raw essay score of 69 (73.0 scaled), and an MBE score of 118 (at the time the required minimum score was 123). The Court found that her combined score was 70.2, which was two hundredths of a point above the minimum required for admission. The Court held that the Board acted arbitrarily when it used its discretion to determine favorably the qualifications of other applicants and did not grant Tillis admission to the bar when she received an overall passing score.
In addition, the Court held that the Board acted arbitrarily with respect to Mayfield. The Court noted that in February, 1989, Mayfield received a raw essay score of 70.3 (74.9 scaled). The Court held that the Board did not uniformly apply its retroactive transfer policy to all candidates similarly situated because Mayfield was denied the transfer of her essay score which was over 20 months *567 old while a white candidate, Powell, was allowed to transfer an untimely score under the "pretext" that she did not receive notice regarding the policy change.
The court further held that although the Board erroneously delayed notifying Irvin that her petition was denied, such action was harmless. Because Irvin had taken the bar on three previous occasions, she was required to take 520 hours of study with an attorney or 12 credit hours from a law school. The court was not convinced that she would have satisfied these requirements prior to the February, 1992 bar had she obtained a prompt response to her November, 1991 petition.
Furthermore, the court held that although Mitchell received the minimum MBE score, she did not receive an adequate essay score, and thus, she failed to meet the requirements necessary for bar admission. The court noted that Mitchell sought to combine and transfer essay scores in different subject areas from various sittings. The court held that this methodology has not been accepted in Mississippi.
The court also held that there was no error in the Board's failure to transfer essay scores for Watkins. The court reasoned that she scored significantly low on the essay exam and a transfer of such scores would have been prejudicial to her obtaining the minimum overall score necessary for admission.
Watkins, Irvin, and Mitchell filed a notice of appeal on November 30, 1992. The Board filed a cross-appeal against Tillis and Mayfield on December 3, 1992 requesting reversal of the order directing their admission to the bar.

II.
The Supreme Court's review of the action of the chancery court in reviewing a Board of Bar Admission's decision is ordinarily de novo. Board of Bar Admissions v. Applicant F, 582 So.2d 377 (Miss. 1991). In this instance the proceedings below were of a hybrid nature as more fully explained in the sub-section that follows. In such proceedings the standard of review is necessarily hybrid as well. To the extent that the trial court makes findings of fact based upon testimony and evidence presented on the discrimination claim, those findings are accorded the same deference that any findings of the chancery court would be accorded. Such findings would only be disturbed upon a conclusion that they were manifestly erroneous. Moore Ex. Rel. Benton County v. Renick, 626 So.2d 148, 151 (Miss. 1993); Cheeks v. Herrington, 523 So.2d 1033, 1035 (Miss. 1988) (citations omitted).

A. WHEN EXERCISING ITS JURISDICTION AS AN APPELLATE COURT, DID THE CHANCERY COURT HAVE AUTHORITY TO ACT AS A TRIAL COURT DE NOVO?
The Board contends that the chancery court improperly held a trial de novo. When acting as an appellate court, the Board contends the chancery court can only consider the record made before the administrative agency. Because the only materials before the Board when making decisions on transfers were the Board rules and petitions of examinees, the Board contends that the court was not authorized to consider extraneous testimony and exhibits introduced during trial. Board of Bar Admissions v. Applicant F, 582 So.2d 377 (Miss. 1991); Miss. Code Ann. Section 73-3-2(2); State Bar Rule XI Section 1.
We recognize that in Applicant F, 582 So.2d at 377, we held that applicants are required to bring matters concerning the merits of their examination before the Board, and that the lower court's review of the matter is limited to whether the Board acted capriciously, arbitrarily or maliciously. Thus, the trial court is limited to reviewing the record made before the Board. However, in those limited cases where allegations go beyond the merits of an applicant's examination, some aspects of a trial de novo may be warranted. We are mindful that the bar admission is within the constitutional domain of this Court. Id. at 378. Thus, there is no separation of powers impediment to trial de novo. See State Tax Commission v. Earnest, 627 So.2d 313, 319 (Miss. 1993); Miss. State Board of Nursing v. Wilson, 624 So.2d 485, 488 (Miss. 1993); Miss. State Tax Commission v. Miss.-Alabama State Fair, 222 *568 So.2d 664, 666 (Miss. 1969). In the present case, examinees assert discrimination claims against the Board in addition to claims regarding the merits of their examination. Mississippi Code Annotated Section 73-3-2(2)(b) provides:
The applicant shall bear the burden of establishing his or her qualifications for admission to the satisfaction of the Board ... An applicant denied admission for failure to satisfy qualifications for admission shall have the right to appeal from the final order of the board to the Chancery Court of Hinds County, Mississippi, within thirty (30) days of entry of such order of denial.
See also State Bar Rule XI.
Neither Section 73-3-2(2)(b) nor the State Bar Rules are adequate to address a discrimination claim. Thus, we conclude that the trial court did not err in hearing testimony de novo.

B. DID THE BOARD ACT ARBITRARILY AND CAPRICIOUSLY WHEN DENYING THE TRANSFER OF ESSAY SCORES SUCH THAT THE CHANCERY COURT SHOULD GRANT EXAMINEES ADMITTANCE TO THE BAR?
Examinees argue, in essence, that the Board has exercised discretion in a number of ways and refused to exercise that same discretion in other ways and that in doing so it has acted arbitrarily and capriciously. More specifically, the petitioners assert that because there is no formal rule limiting the transfer of essay scores to either a 20 month time period or to a raw score of 70, once the Board granted petitions for transfer of essay scores without the benefit of any formal rule or formal notice, the imposition of these parameters was arbitrary. Additionally, they, or some of them, argue that it is equally arbitrary to deny them the opportunity to combine parts of different essay examinations to achieve a passing score. Finally, the examinees contend that the Board's actions have had a disparate impact on black applicants or were deliberately discriminatory.
Although neither is susceptible of exact definition, we find it necessary to attempt to define arbitrary and capricious as the terms relate to agency decision making and rule modifications.
`Arbitrary' means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,  absolute in power, tyrannical, despotic, non-rational,  implying either a lack of understanding of or a disregard for the fundamental nature of things.
`Capricious' means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles. Dept. of Health v. S.W. Miss. Med. Ctr., 580 So.2d 1238, 1240 (Miss. 1991).
It has been held that an agency may modify or otherwise adjust its rules and policies in the light of its experience and changing circumstances. Orleans Audubon Society, et al v. Colonel Lee, 742 F.2d 901, 907 (5th Cir.1984); Motor Vehicle Mfg. Ass. v. State Farm Mutual Aut. Ins. Co., et. al., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). See also McGowan v. Miss. State Oil & Gas Bd., 604 So.2d 312, 319 (Miss. 1992) (an agency has the power to relax its own rules in certain important matters). There is, however, a presumption that policies will be carried out best if the settled rule is adhered to. State Farm, 463 U.S. at 42, 103 S.Ct. at 2866. When an agency abandons a prior determination, the reviewing court should affirm the agency's decision if the final agency action is not arbitrary or capricious." Orleans Audubon Society, 742 F.2d at 907.
The evidence reveals that the Board applied its policy allowing transfers of essay scores evenhandedly to all applicants, and acted in a manner that cannot be deemed arbitrary and capricious. Examinees place emphasis on the fact that Senator Powell, a white applicant, was allowed to transfer her July 1989 essay score to the July 1991 exam in violation of the 20 month rule yet others were not allowed to transfer in contravention of the rule. Examinees' assertion of impropriety *569 is dispelled by Hafter's testimony that the Board searched its files to find and notify all applicants who achieved a 70 or better score within twenty months prior to the policy's adoption. Senator Powell was among four persons who achieved such a score but was overlooked during the search and not notified of her opportunity to transfer. Because of the Board's overlook, Senator Powell was allowed to transfer a score 24 months old. There is no evidence that any other person, black or white was similarly overlooked and nevertheless not allowed to transfer a score.[2]
Tillis obtained a February 1989 raw essay score of 69 (73.6 scaled), thus, her score fell outside of the time frame allowed for transfers. Furthermore, Tillis only sat for the MBE portion of the February 1992 exam and obtained a score of 119. Although Tillis achieved a passing essay scaled score, she has never achieved the minimum MBE score. Thus, even if she had been allowed to transfer her essay score, she would have still failed the bar because she did not achieve the minimum MBE score of 120 necessary to pass.
The trial court reasoned that the Board had the discretion to ignore a rule, formally adopted by this Court, that the minimum MBE score for passage was 123. That is, the trial court observed that discretion was exercised to allow a transfer of essay grades. It follows, in its view, that discretion could have been exercised to admit one who achieved a sufficient average score but failed to achieve the MBE minimum. There is no indication that the Board has ever exercised "discretion" to ignore this or any other explicit rule. Whatever may be said of the wisdom, or lack thereof, of the Board's allowing essay score transfers, it cannot be said that the procedure was explicitly proscribed. What was explicitly prescribed for passage was an absolute minimum MBE score. The Board was powerless to ignore this provision. The trial court erred in concluding that it abused its discretion by following this duly promulgated rule.
The chancellor based her resolution of Mayfield's claim on a finding that the reason given for allowing Powell to transfer her scores from the July 1990 examination to the July 1991 exam was pretextual. No rationale is given for this conclusion. The burden is usually on the plaintiff claiming racial discrimination to prove by a preponderance of the evidence that legitimate non-racial reasons offered by the defendant were a pretext for discrimination. Watson v. Fort Worth Bank and Trust 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). Relevant factors in evaluating pretext in an employment context include the employer's treatment of those similarly situated, the employer's treatment of the complaining party, and statistics as to an employer's employment practices. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); State ex rel. Swyers v. Romines, 858 S.W.2d 862 (Mo. App.E.D. 1993); Whitsey v. State, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989). We find the pretext analysis applied in employment cases applicable to the present case. The essential inquiry in both situations is whether there was disparate treatment of individuals similarly situated so as to raise an inference that the Board's stated reasons for withholding a benefit are merely pretextual. There is no evidence supporting the trial court's finding of pretext in the present case.
While it is true that an exception was made for applicant Powell allowing her to transfer a score more than 20 months old, it is undisputed that Powell was inadvertently deprived of the opportunity to transfer the score at a time within the 20 month period when others similarly situated with Powell were accorded that right. In other words, the benefit accorded Powell was remedial. It served only to restore her to the position that she would have enjoyed but for negligence on the part of the Board. The evidence is clear that those similarly situated to Powell were similarly treated; because Mayfield was not similarly situated, she legitimately did not *570 receive comparable treatment. The testimony is uncontradicted, that Powell was one of four persons who were inadvertently not notified that they were similarly situated with the eight examinees allowed to transfer scores to the February 1991 examination. All such persons were treated alike. In order to rectify the error, Powell was allowed to transfer her scores which were more than 20 months old as a result of the mistake. Mayfield was not similarly situated to Powell and the others in that she had not achieved her passing score within the 20 month period immediately preceding the first opportunity to transfer scores.
Nor is there record support of any other treatment of the complaining party which would give rise to a finding that the remedial reason offered for making the exception for Powell was pretextual. And, finally, the number of black examinees who fell in the category of those allowed to transfer, including one of the original petitioners, falls within the statistical range of the number of black applicants sitting for the examination. There is no statistical support for a finding of pretext with regard to this particular decision.
Moreover, the chancellor's finding that Mayfield would have passed the examination had she been allowed to combine her February 1989 essay score with her February 1990 MBE score of 124 is also unsupported. This Court did not make the 120 minimum score retroactive to 1990. Thus, a 124 on the February 1989 examination would have been below the minimum required to pass. Additionally, a combination of a raw score of 70.3 on the 1989 examine, when scaled to the 1990 exam and combined with the 124 would not produce a passing overall score. Thus the chancellor was manifestly wrong in finding the proffered distinction pretextual and in finding that Mayfield would have passed the examination with the combination of scores described.[3]
Watkins achieved a 67.9 raw essay score in July 1991 which she sought to transfer to the February 1992 exam. This score was far below the threshold score of 70 necessary to transfer. Thus, the Board did not act arbitrarily by denying her petition to transfer. Despite the fact that one could dispute persuasively, the choice of 70.0 as the minimum for transfer in light of the fact that the analogous rule regarding the MBE requires only a minimum not a passing level percentage for transfer, the chancellor ruled correctly. Line drawing is by its nature arbitrary. Essay exams are different than multiple-choice examinations. This Court has opted to maintain a different treatment for transferability altogether. The choice of a passing percentage as the minimum for transfer was well within the range of choices available to the Board given that there was no established absolute minimum on the essay examination. Moreover, there is no showing that any of the examinees who sought to transfer scores below a passing percentage ever achieved a multi-state score sufficient to pass when combined with the essay score sought to be transferred.
Mitchell took the bar four times.[4] Her highest raw essay score was 65.5 which was below the 70 required to transfer. In order to achieve the 70 required, Mitchell sought to pick her best essay scores out of various exam administrations. Such "cherry picking" is not allowed by the rules and there was no evidence presented at trial that such a practice has ever been allowed by the Board. Thus, as the chancellor correctly concluded, the Board did not act arbitrarily by denying Mitchell's petition to transfer.
Irvin sought to transfer her February 1990 raw essay score to the February 1992 exam. Although Irvin argues that she achieved a 66.44 and the Board argues that she achieved a 63.6, Irvin did not achieve a score of 70 or better necessary to transfer. In addition, she sought to transfer a score more than 20 months old. Thus, the Board did not act *571 arbitrarily by denying Irvin's petition to transfer.
Although the Board had no explicit authority to adopt and implement a policy allowing the transfer of essay scores without Supreme Court approval as provided in Mississippi Code Annotated Section 73-3-2 (State Bar Rule II, Section 3), such unauthorized actions neither require that examinees be allowed the right to transfer their scores, nor the right to be admitted to the bar. Using the rules applicable to MBE scores as a model, the Board could rationally believe that examinees achieving a certain essay score suffered an injustice by not having that score treated equally with a minimum MBE score for purposes of transferability and that it was in the Board's discretion to correct the inequity, initially, by allowing essay scores to be transferred on a basis substantially equal to that obtaining for MBNE scores. This is all that the Board did. Thus, although the transfer rule was not sanctioned by this Court and was later eliminated by this Court's order, the Board did have a rational basis for allowing transfers and for the manner in which such transfers were allowed.
An in depth review of the facts reveals that the Board in the present case acted fairly and treated all applicants similarly situated the same. The Board did not use its discretion to grant one applicant a privilege while denying that same privilege to others similarly situated. Thus, examinees' argument that they are entitled to admission to the bar based on arbitrary and capricious Board behavior is without merit.
Because neither of the examinees met the requirements necessary to transfer essay scores nor the requirements necessary to pass the bar, the court's judgment granting Tillis and Mayfield admission to the bar is reversed, and the court's judgment denying Watkins, Irvin, and Mitchell admission to the bar is affirmed.

C. DID THE BOARD VIOLATE EXAMINEES' RIGHTS TO EQUAL PROTECTION WHEN TRANSFERRING ESSAY SCORES?
Examinees assert that they were discriminated against by the Board when attempting to transfer essay scores such that their Fourteenth Amendment equal protection rights were violated. They assert that the relief they are entitled to is admission to the bar.
Examinees argue that the Board granted the right to transfer essay scores to white applicants while denying the same right to black applicants. Furthermore, examinees contend that the Board only gave notice of a change in policy allowing essay transfers to some while denying notice to others. They contend that this difference in treatment between whites and blacks gives rise to a suspect classification necessitating remedial relief as required by United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), and Swann v. Charlotte-Mecklenburg, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
The chancellor made no finding of racial discrimination. The record does not compel such a finding. Of those who benefitted from the Board's foray into essay score transferring, at least one was black. There is no support for the proposition that examinees similarly situated were treated differently at all, let alone because of race. Nor is there support for a claim that the distinctions, i.e. the 20 month time period, analogized to the MBE, requirement which has been in the law since 1983, or the 70.0 raw score requirement drawing a rational line, were adopted with a racially discriminatory motive. There was neither an attempt to show that the procedure adopted by the bar had an impact more racially disparate than the bar examination itself nor an attempt to show that the bar examination as a whole is unlawful. The examinees complained here that they were hindered in this regard by the lack of discovery. The record reflects, however, that the trial court allowed such discovery as was requested.

D. DID THE CHANCERY COURT ERR WHEN IT FAILED TO ADDRESS THE ARGUMENT THAT THE BOARD VIOLATED THE MISSISSIPPI ADMINISTRATIVE PROCEDURES ACT BY NOT FILING AMENDMENTS WITH THE SECRETARY OF STATE?
Examinees argue that Mississippi Code Annotated Section 25-43-1 of the Mississippi *572 Administrative Procedures Act of 1977 (hereinafter APA) regulates the procedural conduct of state administrative agencies with respect to the implementation of and compliance with rules of practice. Examinees argue that by definition, the Board is a state agency because Section 25-43-3 defines agency as "every state board, commission, department or officer, other than the legislature and the Courts, authorized by law to make rules or to determine contested cases." Examinees argue that the Board has continuously violated Section 25-43-7(1) which provides that prior to the adoption, amendment or repeal of any rule, the agency must give thirty days notice of their intended action to the Secretary of State. The notice must state the terms of the agency's intended action, and must provide the manner in which interested persons may present their views. Furthermore, Section 25-43-7(3) provides that rules adopted or amended without being filed with the Secretary of State are null and void.
Examinees argue that although the Board has made changes to the rules, it has not given notice of any adoption, amendment or repeal since 1986. For example, examinees argue that the Board changed the requisite MBE score from 126 to 120 without giving notice to the State. In addition, the Board has allowed the transfer of essay scores not proscribed by rules in existence, and the Board has added five subjects to the essay exam without notice.
Examinees argue that all rules adopted by the Board in contravention of APA requirements are invalid. They argue that the chancery court erred when it failed to address the issue although it was raised and argued.
In the present case, Mississippi Code Annotated Section 25-43-3(a) clearly excludes the courts as an agency to be governed by the Administrative Procedures Act. Pursuant to Mississippi Code Annotated Section 73-3-2(3) (State Bar Rule II, section 3), the Board may not pass any rules without the approval of the Supreme Court. Thus, the Supreme Court, and not the Board, ultimately adopts rules governing the admissions process.
Even if the Board or the Court was governed by the Act and violated the Act by failing to file appropriate documents with the Secretary of State, examinees would not be entitled to admittance to the bar based on such a violation. The rules adopted would, at most, be invalid. Different rule changes sufficient to gain admittance for these examinees would not be compelled.
Because the APA does not apply to bar admission rules adopted by the Supreme Court, the chancery court did not err by failing to address examinees' argument that the Board violated the Act by failing to file amendments with the Secretary of State.

III.
Examinees allege other assignments of error. We have thoroughly reviewed those and find them to be without merit. The chancery court's judgment granting Tillis and Mayfield admission to the bar is reversed, and the court's judgment denying Watkins, Irvin, and Mitchell admission to the bar is affirmed.
AFFIRMED IN PART; REVERSED IN PART.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
SULLIVAN, J., concurs in part with separate written opinion.
PITTMAN, J., concurs in result only.
SULLIVAN, Justice, concurring in part:
Under the present law I believe that Justice Banks has reached the correct result in his opinion.
I write separately to ask this Court, the bench, bar and the law schools in Mississippi to reopen the dialogue about the use and purpose of Mississippi's present system of admitting applicants to the practice of law.
I am not unmindful of the difficulties of both the giving and taking a bar examination. I am aware of the difficulties involved in teaching, giving exams, and grading exams. *573 I would not be surprised if accredited law schools did not harbor some resentment at the notion that their graduates must take another exam to prove that they learned something while in the law school. Yet, I am also aware that the public needs some protection from the inept practitioner who may be an excellent exam taker.
In my opinion it is time for us to revisit admission to the practice of law in Mississippi. The time and expense involved, both to the lawyer giving the exam and the neophyte taking the exam, are great and growing greater. "Admission by ordeal" was never our intent, nor, in my opinion, is it the intent of the examiners.
Nevertheless it is time for re-evaluation. Perhaps the question of diploma privileges to graduates of law schools accredited by the American Bar Association should be placed once again on the table for discussion.
NOTES
[1] By order of this Court dated March 16, 1995, this provision was changed so that the overall requirement is geared to a 200 point scoring system with 132 points needed to pass. The relative weight of the various parts of the exam remains the same and the minimum MBE score of 120 referred to later in the text is eliminated.
[2] We note that examinee Powell did not pass the examination and subsequently filed a petition with this court on other grounds. Her petition was denied. In re Petition of Amy Tuck Powell, Case No. 93-M-0714.
[3] We note that the Board contends that the trial court had no jurisdiction over Mayfield's claim because she failed to file a timely appeal of the Board's order denying her petition. Because we have handled these proceedings in a hybrid manner we do not reach this issue.
[4] In fact Mitchell was allowed to take the bar a fourth time without the required legal study after the third failure. Rule 6, Rules Governing Admission To The Mississippi Bar.