663 So.2d 351 (1995)
Mary Hellen HATTEN, et al., Plaintiffs-Appellees,
v.
Keith PRICE and Wal-Mart Corporation, Defendants-Appellants.
No. 95-257.
Court of Appeal of Louisiana, Third Circuit.
October 4, 1995.
Rehearing Denied December 14, 1995.
Oscar L. Shoenfelt III, Baton Rouge, for Mary Hellen Hatten et al.
James Dey Kirk, Alexandria, for Keith Price & Wal-Mart Corporation.
Before DOUCET, C.J., and YELVERTON and PETERS, JJ.
DOUCET, Chief Judge.
This appeal is confined to questions related to the issue of damages. Defendants, Keith Price and Wal-Mart Stores, Inc. (Wal-Mart) appeal a judgment of the district court alleging the court erred in finding the victim's damages extended past her hospitalization in Lea Regional Hospital in New Mexico and in awarding excessive general damages, past and future medical expenses, and loss of consortium awards. We amend and affirm as amended.

FACTS
This is a suit for damages filed by Mary Hellen Hatten (pursuant to a Power of Attorney) on behalf of her mother, Mae Martin Leviner, who received an erroneously filled *352 prescription from the defendants, and for loss of consortium by Ms. Hatten and her two brothers, Otis and Joe Rhodes.
Pharmacist Keith Price and his employer, Wal-Mart, admit that on August 29, 1992, Mr. Price improperly filled a prescription for "Lasix®" (a diuretic) for the then seventy-six year old Mrs. Leviner with "Inderal®" (a beta-blocker). Defendants further admit that the error resulted in Mrs. Leviner being hospitalized for congestive heart failure (CHF) at Lea Regional Hospital, Hobbs, New Mexico, from September 21, 1992 to September 26, 1992. Thus the major dispute in the case is the extent of plaintiffs' damages caused by the medication error.
Plaintiffs claim that the medication error resulted, not only in the New Mexico hospitalization, but in a subsequent hospitalization in Alexandria and in the necessity of Mrs. Leviner being placed in the nursing home in which she currently resides. Defendants argue that following her admission to Lea Regional Hospital in New Mexico, Mrs. Leviner's medical condition returned to its "baseline" state (i.e. the level at which it was before her taking the erroneously filled prescription) and that any subsequent deterioration in her health was coincidental and due solely to natural causes and/or preexisting conditions.
The trial judge ruled in favor of the plaintiffs, finding that the hospitalizations in both New Mexico and Louisiana, and Mrs. Leviner's subsequent confinement to Lexington House Nursing Home were a result of the medication error, and awarded Mrs. Leviner $700,000.00 in general damages and $89,102.50 in past and future medical expenses. The trial judge also made the following awards for loss of consortium: Mrs. Mary Hatten$50,000.00; Mr. Otis Rhodes$25,000.00; and Mr. Joe Rhodes$10,000.00. We find the record does not support the awards made by the trial judge.
The record reveals that Mrs. Leviner has a history of heart disease dating back to the 1970's. She also has a long history of osteodegenerative arthritis of the back and knees which had gotten progressively worse during her course of treatment by Dr. Gamburg. His notes of Mrs. Leviner's visit in June 1992, reveals that at that visit she moved about the examining room with great difficulty, had trouble getting up out of her chair and had a 2+ pretibial edema in both legs which he did not attribute to her arthritis.
The presence of edema in June 1992 is significant. At that time Mrs. Leviner was taking 20 mgs. of Lasix once a day. On August 6, 1992, she was admitted to Rapides General Hospital with diarrhea, abdominal cramps, fever and weakness. Upon discharge dosage of Lasix was increased up to 40 mgs. twice a day clearly indicating there had been a negative change in her condition. It was following her release from the hospital that Mrs. Leviner's prescription for Lasix was erroneously filled precipitating her hospitalization in New Mexico. Expert testimony confirms that the prescription error was the most likely cause of that hospitalization and defendants do not argue that point.
Mrs. Leviner's admitting diagnosis to Lea Regional Hospital on September 21, 1992, was congestive heart failure, hypokalemia, hypertension, unifocal PVC's, urinary retention, possible Xanax addiction with withdrawal and mental confusion. Medical examination upon admission described her as "severely obese" with "2+ pitting edema of both legs." The medication error which gave rise to this suit was discovered at this time. I.V. Lasix was administered; following which, she diuresed more than three liters of fluid. Following the excretion of the retained fluid, she immediately began to feel better.
During her stay at Lea Regional, Dr. Kernan, who was treating her, noted the following: "I personally felt that mentally and physically, this patient was not capable of living by herself. [...] It was [...] noted that the patient became extremely agitated when she did not receive an extra dose of Xanax. She apparently had been taking Xanax for at least the last three years and maybe longer. I felt there was a strong possibility that she was having Xanax withdrawal problems and this probably explained some of her severe irritability and mental agitation. This [...] made me very concerned about the possibility of having her live by herself."
*353 Mrs. Leviner was discharged from Lea Regional Hospital on September 26, 1992 with instructions to see her family doctor in Louisiana for follow-up (she was discharged with an indwelling Foley catheter). Her discharge medications included Xanax, but not Lasix. Upon her return home, she once again began a regimen of eighteen (18) medications, including 40 mgs. of Lasix twice a day, Xanax 0.5 mg. four times a day and 1.0 mg. at bedtime.
On October 1, 1992, she saw Dr. Douglas Gamburg, who had been treating her for arthritis for over five years. Dr. Gamburg noted that the medication he had prescribed for Mrs. Leviner sometime before she left for New Mexico, Relafen, had been discontinued by a doctor in New Mexico and replaced by Clinoril, a medication which did not appear to be as effective for Mrs. Leviner as the Relafen had been. Dr. Gamburg further noted that Mrs. Leviner complained of bilateral knee pain and not being able to get around anymore.
Ms. E. Moulard, a Registered Nurse, visited Mrs. Leviner on October 2, 1992 as part of Rapides General Hospital's Home Health/Hospice Care program. Ms. Moulard observed Mrs. Leviner to be awake, alert and able to ambulate within the confines of her home (i.e. approximately 15 to 20 feet at a time). She noted that Mrs. Leviner complained of exertional dyspnea, shortness of breath and that her patient had a periodic, nonproductive cough which was preceded by moist rales in her upper bronchus. Mrs. Moulard also observed that her patient exhibited only a trace of edema in the lower extremities, and no edema in the upper extremities. Mrs. Leviner's catheter had been removed the day before by Dr. Brian, and while she complained of difficulty in voiding during the night, she relayed that she had been voiding well during her waking hours.
Shortly thereafter, on October 4, 1992, Mrs. Leviner was admitted to Rapides General Hospital. Her admitting diagnosis was chronic obstructive pulmonary disease with active exacerbation and hypokalemia (low potassium). Dr. Gregory Brian, who had assumed care for Mrs. Leviner in 1991, but had only seen her three times prior to her hospitalization, consulted Dr. P.K. Kaimal, a cardiologist who had been seeing Mrs. Leviner since 1987, to evaluate her heart condition. Dr. Kaimal testified that Mrs. Leviner exhibited some indications of CHF upon admission and that he started her on two diuretics at that time. He stated that by October 12, 1992, he saw no evidence of any CHF. He did note that the patient exhibited general weakness, but he attributed the weakness to her being confined to bed. He did not relate her weakness to her prior hospitalization in New Mexico. Dr. Kaimal further stated that Mrs. Leviner's cardiac condition was stable at discharge, that there was no reason related to her cardiac condition which would have required nursing home care and that he was never asked his opinion on the necessity of Mrs. Leviner being admitted to a nursing home. Finally, Dr. Kaimal, stated that he has neither treated nor been consulted about Mrs. Leviner's condition since that time.
When asked why he admitted Mrs. Leviner to Rapides General in October 1992, Dr. Brian stated: "At that time, she was complaining of shortness of breath, severe cough; also, her Potassium was low, and I felt that she had developed bronchitis, and subsequently, went back into congestive heart failure ..." (emphasis ours). He stated that he attributed both her generalized weakness and her urinary tract infection (UTI) to her hospitalization in New Mexico. We note, however, that Dr. Brian had treated Mrs. Leviner for UTI during her August 3, 1992, admission to Rapides General, before her trip and that the records from Rapides General Home Health Care show she was alert and able to ambulate in her apartment just two days before she was readmitted to Rapides General. Further, we note that in his discharge summary from Rapides General Dr. Brian states the following: "At family's request and insistence, the patient was kept in the hospital longer than expected but eventually discharged on 10/16/92 in improved condition and she was transferred to Lexington House Nursing Home." When queried about what effect, if any, Mrs. Leviner's New Mexico hospitalization played in her October admission to Rapides General and her subsequent confinement to Lexington *354 House, he replied: "I think that that's the point [her hospitalization in New Mexico] at which, temporally speaking, that sheher normal activities were never the same after that hospitalization".
Upon admission to Lexington House Mrs. Leviner was placed on 20 mgs. of Lasix once a day.

LAW AND DISCUSSION
This case must be decided by this court under the manifest error standard enunciated by our supreme court. In Rosell v. ESCO, 549 So.2d 840 (La.1989) at 844-845 the court stated:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La. 1978); A. Tate, `Manifest Error' Further observations on appellate review of facts in Louisiana civil cases, 22 La.L.Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). In applying the manifestly erroneous clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. See, F. Maraist, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium, Civil Procedure, 40 La.L.Rev. 761, 764 (1980); Comment, Appellate Review of Facts in Louisiana Civil Cases, 21 La.L.Rev. 402, 412 (1961); Cf. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Canter, supra at 724; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825, 826 (La.1987); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999, 1001 (La.1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247, 1249 (La.1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300, 301 (La.1979). Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. See, Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir.1983), writ denied, 443 So.2d 586 (La.1983). Cf. State v. Mussall, 523 So.2d 1305 (La.1988); Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); U.S. v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). But where such factors are not present, and a factfinder's finding *355 is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. See, Jackson v. Tate, 428 So.2d 882, 884 (La.App. 1st Cir.1983), citing McDonald v. Book, 215 So.2d 394 (La.App. 3d Cir.1968), overruled on other grounds, Celestine v. Hub City Motors, Inc., 327 So.2d 700 (La.App. 3d Cir.1976). Cf. Anderson, supra, at 575, 105 S.Ct. at 1512; Schexnider v. McDermott International Inc., 868 F.2d 717, 720 (5th Cir.1989); Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 770 (5th Cir.1989); U.S. v. Hibernia National Bank, 841 F.2d 592, 595 (5th Cir.1988); Hanson v. Veterans Administration, 800 F.2d 1381, 1388 (5th Cir. 1986). [footnote omitted].
In analyzing this case, we find it similar to the case of Cazes v. Raisinger, 430 So.2d 104 (La.App. 5 Cir.1983). In that case Mrs. Mary Cazes, a 71-year-old heart patient who also suffered from diabetes, was discharged from the hospital on August 2, 1980, with a prescription for Lanoxin®, her regular heart medicine. Three days later she was readmitted with symptoms of Lanoxin overdose. It was discovered that the prescription bottle, which was supposed to read "One tablet daily" had been mislabeled by a pharmacist and read "One tablet four times a day". Mrs. Cazes was treated in the emergency room and released with instructions to wait two days, then begin taking one Lanoxin tablet each morning. On January 16, 1981, Mrs. Cazes died of acute myocardial infarction, as a consequence of coronary artery disease and chronic pulmonary disease. Mrs. Cazes' heirs filed suit against the pharmacist who had mislabeled her Lanoxin the previous August and his employer. The petition alleged that Mrs. Cazes died as a result of the overdosage of Lanoxin aggravating her pre-existing heart and circulatory problems. The trial court found in favor of the plaintiffs and awarded general damages in survivorship of $40,000.00.
Our brethren of the fifth circuit stated the law applicable to the case thusly:
Pharmacists are held to a high degree of care, as stated in Trumbaturi v. Katz & Besthoff, 180 La. 915, 158 So. 16 (La.1934) [158 So.] at 19, quoting from Walton et al v. Booth, 34 La.Ann. 913:
`In the discharge of their functions, druggists and apothecaries, persons dealing in drugs and medicines, should be required not only to be skillful, but also exceedingly cautious and prudent, in view of the terrific consequences which may attend, as they have not unfrequently in the past, the least inattention on their part. Cooley on Torts, pp. 75, 76; 648-9.'
The same quotation is found in Marigny v. Dejoie, 172 So. 808 (La.App.1937). In that case the pharmacy was held for negligently filling a prescription with a medication other than that prescribed. In Davis v. Katz & Besthoff, Inc., 333 So.2d 698 (La.App. 4th Cir.1976), the court awarded damages to a customer who was given another person's prescription bottle in a bag labeled with her own name and that of her physician. The plaintiff was not barred from recovery for the ill effects of the medicine by contributory negligence in failing to check the bottle.
Id. at 107.
The court amended the trial court's award, deleting damages for the wrongful death of Mrs. Cazes, stating the following:
We find that while the record supports an award of survivorship damages, we [...] limit the plaintiff's recovery to an award for the pain and suffering attributable to the Lanoxin overdose but not the general worsening of her pre-existing heart disease. The Lanoxin toxicity caused Mrs. Cazes to become weak and she fainted, resulting in her being brought to the hospital emergency room. She suffered from anorexia, nausea, vomiting and diarrhea, and had visual disturbances. She exhibited some anxiety over the medication and had difficulty adjusting to the prescribed dosage, requiring her to seek psychiatric help as well as medical help.
Id.
We find the situation in Cazes to be very similar to the situation at hand. In the case at bar a mistake was made, the results of *356 that mistake were corrected and the patient's life went on. More specifically, the plaintiff's own expert in pharmacology, Dr. Sorell Schwartz, stated that Inderal, the erroneously substituted drug, would be cleared from the system in "about nine to twelve hours". Dr. Schwartz deferred the answer to the question regarding any residual effects on Mrs. Leviner's pre-existing heart condition to her cardiologist, in this case Dr. Kaimal. Dr. Kaimal stated that by October 12, 1992, Mrs. Leviner exhibited no evidence of CHF and that, at that time he could see no reason for her to be confined to a nursing home.
In sum we have a 76-year-old lady with multiple health problems (gleaned from the records of Rapides General Hospital dating back to 1986, and the records of several of her doctors including Drs. Kaimal and Gamburg) including congestive heart failure, atherosclerosis, secondary hypertrophic cardiomyopathy, hypertension, chronic obstructive pulmonary disease, diverticulitis, hiatal hernia, glaucoma, degenerative arthritis, bursitis, obesity, anxiety and probable Xanax addiction. Due to a pharmacy error she took several doses of Inderal and missed several doses of Lasix, drugs which directly (Inderal) and indirectly (Lasix) effect the function of the heart. The mistake was discovered and corrected and expert testimony established that in not more that twelve hours the Inderal would have cleared the lady's system. Lasix was administered intravenously upon her admission to the hospital, correcting the missed doses of that drug also in a matter of hours. Mrs. Leviner was discharged and returned from New Mexico to Alexandria unaccompanied. Increased doses of diuretics (Lasix 40 mgs. twice a day and Zaroxolyn 2.5 mgs. each A.M.) were continued and the patient was ultimately readmitted to Rapides General. She was treated by Dr. Brian, a family practitioner, and by Dr. Kaimal, her cardiologist. When Dr. Kaimal signed off on the case, October 12, 1992, he felt her coronary problems were under control and saw no reason to confine Mrs. Leviner to a nursing home. Upon admission to the nursing home, Mrs. Leviner's fluid retention problem was controlled by 20 mgs. of Lasix daily.
In reaching his conclusions on the case, the trial judge stated that he relied on the opinion of Dr. Brian. We find such reliance clearly erroneous. The foregoing facts do not support Dr. Brian's conclusions. Additionally, we find it manifestly erroneous to accept the opinion of a family practitioner who had only seen Mrs. Leviner three times over a period of fifteen months before her August 1992 hospitalization over that of her cardiologist, who had performed her angioplasty and had been treating her for six years. Further, the testimony of plaintiff's expert pharmacologist does not support the findings of Dr. Brian, and, in fact, he deferred to Dr. Kaimal on the question of lasting effects of the drug error. We also note that the records of Rapides General Home Health and Lexington House establish that Mrs. Leviner was on the same dosage of Lasix in June 1992, before the incident and on October 16, 1992, the day she was discharged from Rapides General and admitted to Lexington House. Accordingly, Mrs. Leviner's hospitalization in Rapides General in October 1992 could possibly have been the result of the medication error (based upon the fact that she stayed on increased doses of diuretics until the end of stay at Rapides General). While we cannot say that the trial court's conclusion as to the cause of the Rapides General hospitalization was manifestly erroneous, we find clear error in its holding that the subsequent acerbation of her preexisting health problems was attributable to the drug error.
Just as our brethren did in Cazes, we find that damages are due Mrs. Leviner and her children for her pain and suffering due to the Lasix-Inderal error and for their loss of consortium in connection therewith, but not for the general worsening of her pre-existing conditions.
Accordingly we amend the trial court awards as follows: to Mrs. Mae Leviner, for her two hospitalizations, with attendant discomfort and suffering, and anxiety over her condition $35,000.00 in general damages and $21,419.25 in past medical expenses; we reverse the awards to her children for loss of consortium. In all other respects the judgment of the trial court is affirmed. *357 Costs of this appeal are to be shared equally by appellants and appellees.
AMENDED IN PART; REVERSED IN PART; AND RECAST.