# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 7, 2013

No. 12-60597, Cons. w/ 12-60600

Lyle W. Cayce
Clerk

L & F HOMES AND DEVELOPMENT, L.L.C., doing business as Hyneman Homes; LARRY MITRENGA,

Plaintiffs-Appellants

v.

CITY OF GULFPORT, MISSISSIPPI,

Defendant-Appellee

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Cons. w/ 12-60601

LARRY MITRENGA,

Plaintiff-Appellant

v.

CITY OF GULFPORT, MISSISSIPPI,

Defendant-Appellee

Appeals from the United States District Court
for the Southern District of Mississippi
USDC No. 1:10-CV-387

Before GARZA, SOUTHWICK, and HAYNES, Circuit Judges.

No. 12-60597, Cons. w/ 12-60600, 12-60601

PER CURIAM:[*]

L&F Homes and Development, LLC and Larry Mitrenga were denied water service from the City of Gulfport for a planned residential development called "Roundhill." L&F and Mitrenga sued Gulfport for discrimination under 42 U.S.C. § 1982, the Fair Housing Act ("FHA"), and the Equal Protection Clause; for violations of the Takings Clause and substantive due process; for procedural due process deprivation; and on state law claims related to breach of contract. The district court granted summary judgment to Gulfport on all claims. We AFFIRM.

## FACTUAL BACKGROUND

The relevant background of this case falls into three broad categories: approvals granted to L&F's Roundhill development, treatment of a neighboring development tract referred to as "781," and Gulfport's fire flow requirements.

In March 2006, Gulfport issued what is called a "will serve letter" to the predecessor in interest of Roundhill, which confirmed there was water and sewer service available to the property. In August 2006, Gulfport entered into a Wastewater Service Agreement with the then-owner of Roundhill. Subsequently, Mississippi officials approved the sewer plan; Gulfport then inspected the Roundhill property and prepared a list of items the developer had to complete. In January 2007, a work order was issued for installation of a City water meter on Roundhill. After 2007 there is some evidence that the water system at Roundhill was at least partially active, but L&F never paid for water service, and there is no evidence of payment by any other entity.

In 2008, Gulfport issued a will serve letter to the 781 development, which was on land neighboring Roundhill and on the same Landon Road water line.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-60597, Cons. w/ 12-60600, 12-60601

At that time, the 781 project was a townhouse complex. Gulfport refused to issue a new will serve letter in the fall of 2009, after 781's development plan shifted to a cottage complex. Later, at a June 2010 hearing before a governing board for the county, 781 was further denied a conditional use permit on the basis that "the development is incompatible with the neighborhood." At this hearing, various Gulfport representatives offered reasons why 781 would be incompatible. These included problems regarding traffic and parking, light and noise, danger to children posed by vehicles, fire protection, crime, and consistency with other city development plans. One Gulfport representative made references to crime problems at a Federal Emergency Management Agency park in Gulfport, a park with predominantly black residents located in an area that otherwise had primarily white residents.

In November 2006, City Ordinance 2501 increased the fire flow requirements for residential developments such as Roundhill and 781 from 500 gallons per minute ("gpm") to 1000 gpm. This measure identified the amount of water available at a given location by connection to water sources for firefighting needs. In November 2009, Gulfport received a hydraulic analysis by the Garner Russell firm that stated the fire flow capacity for the water line servicing Roundhill and 781 was only 600 gpm, not the required 1000 gpm. Subsequent testing confirmed this deficiency.

In February 2010, Gulfport denied final approval of water service to Roundhill. In March 2011, after this present lawsuit had been filed, Gulfport began supplying water service to Roundhill from a new water line constructed by the county. In March 2012, Gulfport excavated a portion of the Landon Road line that had earlier been found insufficient to service Roundhill. A nearly-closed water valve was discovered. After the valve was opened, it appears that the Landon Road water line could supply the Roundhill property.

3

No. 12-60597, Cons. w/ 12-60600, 12-60601

The district court granted summary judgment in favor of Gulfport on all claims arising from Gulfport's denial of water service to Roundhill. Both L&F and Mitrenga appeal.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Onoh v. Nw. Airlines, Inc.*, 613 F.3d 596, 599 (5th Cir. 2010). We view all evidence in the light most favorable to the non-moving party. *Id.* Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"We review questions of jurisdiction, and specifically standing, *de novo*." *Bonds v. Tandy*, 457 F.3d 409, 411 (5th Cir. 2006).

## I.      *Section 1982*

Section 1982 states: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. A discrimination claim typically requires a showing that the plaintiff is "a member of a racial minority." *See Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997). Yet "whites have a cause of action under Section 1982 when discriminatory actions are taken against them because of their association with blacks." *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982). The "association" in *Woods-Drake* was white resident-plaintiffs who were threatened with eviction "if they continued to have black guests." *Id.*

No. 12-60597, Cons. w/ 12-60600, 12-60601

L&F does not claim status as a racial minority. Instead, it asserts that Roundhill was denied water service because of the development's temporal and physical proximity to 781, which was a housing development allegedly likely to be occupied by a majority of black residents. Roundhill and 781, on adjacent tracts, both applied for water service that would need to come from the same Landon Road line. The properties are subject to different development plans and owned by distinct corporate entities. In effect, L&F asserts Roundhill was denied water service so that Gulfport's denial of service to 781 would not appear to be motivated by race. *Woods-Drake* protects whites who are punished for their support of or interaction with minorities. *Id.* (summarizing cases). We do not accept that the discrimination prohibited by the *Woods-Drake* reasoning reaches situations where a non-minority alleges it was part of the collateral damage resulting from its coincidental presence in the queue for a governmental benefit at the same time and location as a minority.

L&F lacks standing to bring a Section 1982 claim.


II.     *Fair Housing Act*

The FHA applies to "any person who . . . claims to have been injured by a discriminatory housing practice." 42 U.S.C. § 3602(i)(1). The "sole requirement for standing under the FHA is the Article III minima." *Lincoln v. Case*, 340 F.3d 283, 289 (5th Cir. 2003) (citation omitted). We analyze FHA claims under a burden-shifting framework. *See Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1556-57 (5th Cir. 1996).

Standing for an FHA claim does not require association with minorities. It is enough that L&F claims that Gulfport's supposed discrimination against the other development led to its own damage. For example, the Supreme Court noted that the distinction between standing for first-party test purchasers and

No. 12-60597, Cons. w/ 12-60600, 12-60601

for third-party neighborhood residents was "of little significance [under the FHA;] . . . the only requirement for standing to sue" was distinct and palpable injury fairly traceable to the challenged action (i.e., injury in fact). *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 375-76 (1982).

L&F has standing to claim that Gulfport discriminated for racial reasons against another development and that discrimination injured L&F as well. It must "show that race was a consideration and played some role in a real estate transaction" to establish a *prima facie* case. *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986). Discriminatory consideration of race under the FHA can be demonstrated by either "a showing of a significant discriminatory effect" or "proof of discriminatory intent," that is disparate impact or discriminatory treatment. *Id.* L&F claims discrimination on both theories.

## A.     *Disparate Impact*

"[D]isparate-impact claims 'involve [policies or] practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (discussing claims under the Americans with Disabilities Act). The Supreme Court has not previously answered and has just granted a writ of certiorari on this question: "Are disparate impact claims cognizable under the Fair Housing Act?" *Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly*, 658 F.3d 375 (3d Cir. 2011), *cert. granted*, 133 S. Ct. 2824 (2013).

We need not await the Supreme Court's decision because the plaintiffs' claim fails regardless of the answer. Beyond just alleging the existence of a disparate impact, L&F would have to identify a "specific test, requirement, or practice" that is responsible for the disparity. *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (discussing claim under the Age Discrimination in Employment

6

Act). L&F asserts that the likely racial composition of the hypothetical 781 development would be at least 60% black and that denying 781 the ability to develop creates a disparate impact. Even if that is true, L&F has failed to describe a specific neutral practice or policy that "falls more harshly" on a protected group than on others; that failure means the disparate-impact theory is inapplicable. *Cf. Pacheco v. Mineta*, 448 F.3d 783, 792 (5th Cir. 2006) (dismissing disparate-impact claims where an administrative charge complained only of disparate treatment).

If there is a claim under the FHA, it is for disparate treatment.

B.    *Disparate Treatment*

"Disparate treatment" is "deliberate discrimination." *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000). Such discrimination is shown by evidence of discriminatory action or by inferences from the "fact of differences in treatment." *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

Turning first to direct evidence of discrimination, L&F points to statements made by Gulfport representatives at a June 2010 public hearing conducted by the county on the subject of 781's conditional use permit. L&F highlights the testimony of a police officer who stated: "What I see is this is a footprint the same as a FEMA park. If you know of anything that we dealt with in a FEMA park, we were constantly having drug problems, shootings, rapes, and stuff like that. Now I feel we are going to have the same issues here . . . . You may have someone there that is a [pedophile] that is going to be watching kids over there." Other concerns included problems with traffic and parking, light and noise, danger to children posed by vehicles, fire protection issues, and consistency with other city development plans. One city resident also mentioned concern over the depression of property values. No speaker at the hearing mentioned race.

This evidence does not support that any City official acted with racial motivations.  L&F also points to evidence that when it requested testing of the Landon Road line in April 2010, Gulfport expressed concerns that testing on behalf of L&F could adversely impact settlement negotiations in Gulfport's litigation with 781.  Without more, the stated concerns about a lawsuit being at a delicate stage of settlement do not equate to evidence of discrimination.

L&F also attempts to show that the Roundhill development was qualified for water service but had the service denied, whereas similarly situated residents were treated differently.  *See Munoz*, 200 F.3d at 299.  As a threshold matter, L&F does not claim that prior to the excavation of the Landon Road line in March 2012, Roundhill or 781 satisfied the fire flow requirements of the 2006 ordinance.  Rather, L&F asserts that the Landon Road line "had the capacity to provide ample fire flow" such that *if* the closed valve had been open in 2010, Roundhill would have been qualified.  What might have occurred had all the facts been known does not matter.  On February 22, 2010, the Landon Road line as then-operational could not supply fire flow of 1000 gpm to Roundhill.  There is no evidence Gulfport knew of the closed valve, which might make the denial pretextual.  Roundhill was, therefore, not qualified.

Even though Roundhill was not qualified, L&F attempts to show "that race was a significant factor in the refusal" because other similarly situated developments were approved notwithstanding a lack of verification of compliance with the ordinance.  *See Artisan/Am. Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 295 (5th Cir. 2009).  A proper point of comparison is a "nearly identical, similarly situated individual[ ]." *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

The most relevant comparator to which L&F points is Holliman Place, a residential development within Gulfport city limits, which received a will serve

No. 12-60597, Cons. w/ 12-60600, 12-60601

letter in 2008.    Holliman did not receive final approval until 2011 after satisfactory fire flow testing.  Although testing demonstrated inadequate fire flow on December 8, 2011, uncontradicted evidence suggests that a "looping" modification rendered the fire flow adequate on December 9, 2011.  This looping modification means Holliman was not a nearly identical comparator.

L&F also identifies Sam's Club, Rooms to Go, and the English Manor residential development, as comparators.  L&F does not point to inadequate fire flow testing on these sites in a contemporary time period, prior to final approval.  Further, Gulfport testified that Sam's Club and Rooms to Go had internal sprinkler systems that would justify a variance from the ordinance, and that looping of water lines and the placement of fire hydrants were also considerations.  English Manor received final approval before the effective date of the ordinance.[1]

Gulfport's determination of compliance with the ordinance primarily relied on a developer's engineers.  In November 2009, Gulfport received a report indicating that the Landon Road line produced a fire flow below 1000 gpm, putting Gulfport on notice that the general fire flow capacity of the Landon Road line was inadequate.  We have been pointed to no evidence that Gulfport approved a residential development for water service after this date without verifying compliance with the 1000 gpm requirement.

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Nonetheless, L&F has failed to carry it.  The district court properly dismissed the disparate treatment and disparate impact claims.

---

[1] L&F refers to other residential developments that Gulfport allowed to proceed after the enactment of the ordinance, but discovery did not unearth relevant records of pre-approval, inadequate fire flow testing supportive of discrimination.  Although here, as in other instances, L&F points to Gulfport's unsatisfying production of records, L&F does not appeal any of the district court's discovery rulings.

9

No. 12-60597, Cons. w/ 12-60600, 12-60601

III.   *Equal Protection*

An equal protection claim may be "brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Similarly, an equal protection plaintiff can prevail under a selective enforcement theory by showing "that the selective enforcement was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Allred's Produce v. U.S. Dep't of Agric.*, 178 F.3d 743, 748 (5th Cir. 1999) (quotation marks omitted).

The ordinance establishes requirements in order to maintain sufficient water pressure to fight fires.  There is no evidence or even argument that the ordinance, by utilizing the fire flow requirements of the 2003 International Fire Code, is "irrational" or "arbitrary."  *See Olech*, 528 U.S. at 565.  The ordinance provides for differential treatment of property depending on the use to which the property is put, and that too is not irrational.  *See Mikeska v. City of Galveston*, 451 F.3d 376, 381 (5th Cir. 2006).

L&F does not really argue that the ordinance itself is irrational.  Instead, it claims that Gulfport selectively enforced the ordinance against Roundhill and not against other developments.  We have already discussed that L&F has not identified in the record a similarly situated comparator against whom the ordinance was not enforced.  It was not until November 2009 that Gulfport became aware of testing that documented the inadequacy of fire flow of the relevant portion of the Landon Road line.  Holliman satisfied the requirements of the ordinance and was approved.  The commercial buildings, though also covered by the ordinance, qualified for exceptions or reductions in the fire flow requirements.  The record arguably does not demonstrate diligent inquiry,

10

enforcement, or record keeping by Gulfport, but there is no evidence of instances in which Gulfport was aware of noncompliance and nonetheless issued a final approval of water service.

For L&F to succeed in a selective enforcement claim, it "must prove that the government [was] motivated by improper considerations, such as race." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000). L&F has not shown evidence that, either by its statements or actions, Gulfport's denial of water service to Roundhill was "deliberately based upon an unjustifiable standard such as race." *Allred's Produce*, 178 F.3d at 748.

The district court properly dismissed the Equal Protection claim.


## IV.    State Law Claims

L&F raises state law claims of breach of express contract, breach of implied contract, and equitable estoppel.

## A.    Express Contract

In Mississippi, "an enforceable contract must appear in the official minutes of a public board." *Bruner v. Univ. of S. Miss.*, 501 So. 2d 1113, 1115 (Miss. 1987). It is the responsibility of the contracting party to ensure that such contracts are properly recorded in such minutes. *Id.* In a breach of contract suit, the plaintiff must prove the existence of a valid contract by a preponderance of the evidence. *Garner v. Hickman*, 733 So. 2d 191, 195 (Miss. 1999). "The existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury or a judge in a bench-trial." *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 59 (Miss. Ct. App. 2011). "Questions concerning the construction of contracts are questions of law that are committed to the court," and which we review *de novo*. *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 110 (Miss. 2005).

No. 12-60597, Cons. w/ 12-60600, 12-60601

First, L&F argues that in early 2007, Gulfport approved and accepted Roundhill's water system. What we find in the record is a work order in January 2007 for installation of a water meter at Roundhill. There was evidence that after this date Roundhill received water. Gulfport counters that there is no record of the actual installation of a water meter and that no entity ever paid for water at Roundhill. Whatever the meaning of these 2007 events, there is no evidence of a written agreement such as one in which Gulfport agreed to provide water service.

Second, two documents appear in Gulfport's official minutes: a will serve letter and a wastewater service agreement. The will serve letter states that Roundhill was *eligible* for sewer and water service. A notification of eligibility does not constitute an agreement to provide water service. It instead contemplates multiple additional steps and specifically references the need for a future final approval and inspection. Among the requirements for a contract is definiteness, which this letter does not provide. *Rotenberry v. Hooker*, 864 So.2d 266, 270 (Miss. 2003). The second writing is a "Wastewater Service Agreement" through which Gulfport agreed to treat Roundhill's wastewater; the terms of this agreement plainly only apply to wastewater.

The will serve letter and the wastewater agreement do not establish that Roundhill expressly contracted with Gulfport for water service.

B.   *Implied Contract*

An implied contract arises "from a mutual agreement and intent to promise, but where the agreement and promise have not been fully expressed in words." *Kaiser Invs., Inc. v. Linn Agriprises, Inc.*, 538 So. 2d 409, 413 (Miss. 1989). A contract implied in fact has the same binding legal effect as an express contract. *Franklin v. Franklin ex rel. Phillips*, 858 So. 2d 110, 120 (Miss. 2003).

No. 12-60597, Cons. w/ 12-60600, 12-60601

The district court held that the claim is barred by sovereign immunity. We agree. Mississippi provides for governmental immunity in breach of implied contract suits involving "the issuance, denial, suspension or revocation of, or the failure or refusal to issue, deny, suspend or revoke any privilege, ticket, pass, permit, license, certificate, approval, order or similar authorization . . . ." MISS. CODE ANN. § 11-46-9(1)(h); *see City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 711 (Miss. 2005). The governmental unit forfeits this immunity when a decision "is of a malicious or arbitrary and capricious nature." MISS. CODE ANN. § 11-46-9(1)(h).

A decision is not arbitrary and capricious when it is "fairly debatable" or "supported by substantial evidence," defined as "affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1203 (Miss. 2003). This is a highly deferential standard. *Id.* at 1202-03. As of February 22, 2010, Gulfport understood that inadequate fire flow was then reaching Roundhill, and Gulfport did not yet know of the closed valve. Consequently, Gulfport's decision to deny water service is at least fairly debatable. *See Watkins v. Miss. Bd. of Bar Admissions*, 659 So. 2d 561, 568 (Miss. 1995).

Immunity is also waived when a decision is "malicious." MISS. CODE ANN. § 11-46-9(1)(h). At least two definitions might be attributed to the word malicious in this context. The first is that an act be "[w]ithout just cause or excuse." BLACK'S LAW DICTIONARY (9th ed. 2009). That definition does not differ meaningfully from "arbitrary and capricious." Gulfport's denial was not arbitrary based on what the city knew about water flow. A second definition is more intent-based: "Substantially certain to cause injury" or with the "intention or desire to harm another usu. seriously through doing something unlawful or otherwise unjustified." BLACK'S LAW DICTIONARY (9th ed. 2009); WEBSTER'S

13

THIRD NEW INTERNATIONAL DICTIONARY 1367 (Merriam-Webster 1993). In applying a similar standard, Mississippi has at least suggested that a malicious act may be one violative of the constitutional rights of a party. *See In re Dean*, 972 So. 2d 590, 594 (Miss. 2008) ("this Court will reverse the Board's decision only upon finding that it was 'arbitrary, capricious or malicious' in that it was unsupported by substantial evidence or violated a constitutional right of the party"). We have already explained why the record does not support that Gulfport's denial was based on a constitutionally impermissible basis.

L&F's claim for breach of implied contract is therefore barred by sovereign immunity.

## C.    *Equitable Estoppel*

L&F also seeks damages under an estoppel theory. The argument is that after Gulfport assured L&F that its development could proceed, Gulfport was estopped from reversing positions.

Estoppel may arise even though a defendant is a municipality. *Mayor & Bd. of Aldermen, City of Clinton v. Welch*, 888 So. 2d 416, 432 (Miss. 2004). An estoppel claim requires: "(1) belief and reliance on some representation; (2) change of position, as a result thereof; and (3) detriment or prejudice as a result of the change of position." *Id.*

The relevant representations here are in the will serve letter and the alleged oral statements made by City officials. As to the oral statements, L&F alleges that the Gulfport Director of Public Works told Mitrenga and another L&F representative, Steve Elrod, that there were no impediments to the development of Roundhill, and that the project was "good to go." Accepting as true that these statements were uttered, these statements do not support estoppel as a matter of law. There is no evidence that the Gulfport Director of Public Works who made these statements had the power to authorize

No. 12-60597, Cons. w/ 12-60600, 12-60601

exemptions from the ordinance, and "ordinarily the unauthorized acts of one of its officials does not estop a municipality from acting in its governmental capacity." *Suggs v. Town of Caledonia*, 470 So. 2d 1055, 1057 (Miss. 1985).

The district court's opinion did not address the will serve letter as a representation potentially supportive of estoppel. L&F's summary judgment briefing on the issue refers only to "assurances improperly given" and discusses various oral representations. L&F's complaint refers to "Gulfport's representations that the Roundhill subdivision was an existing entitled community as of December 2009." L&F did not urge before the district court that it detrimentally relied on the will serve letter.[2] Arguments not presented to the district court are waived. *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 257 n.15 (5th Cir. 2008).

L&F has failed to establish an equitable estoppel claim that withstands summary judgment.

## V.    *Substantive Due Process*

"A violation of substantive due process . . . occurs only when the government deprives someone of liberty or property." *Simi Inv. Co., v. Harris Cnty.*, 236 F.3d 240, 249 (5th Cir. 2000). This claim requires a showing of (1) a constitutionally protected right and (2) an arbitrary, irrational abuse of power that effects that deprivation. *Id.*

---

[2] Estoppel is an equitable remedy appropriate "only when equity clearly requires it" to avoid a result that is unconscionable or the perpetuation of fraud or injustice. *B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 491 (Miss. 2005); *Kimball Glassco*, 64 So. 3d at 947. Here, the will serve letter was issued in 2006, before the passage of the ordinance, and approximately four years prior to the denial of water service to Roundhill. To the extent that L&F relied on the will serve letter, that reliance was not reasonable. *See Trosclair v. Miss. Dep't of Transp.*, 757 So. 2d 178, 181 (Miss. 2000).

No. 12-60597, Cons. w/ 12-60600, 12-60601

Even if L&F had a constitutionally protected right to the relevant water service, a deprivation is unconstitutional only if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996) (quoting *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926)). By contrast, a deprivation will be sustained if "the question is at least debatable" "whether a rational relationship exists between the [policy or decision] and a conceivable legitimate objective." *Simi Inv. Co.*, 236 F.3d at 251.

We do not "insist that a local government be right" or that a regulation be the best means of advancing a given end, only that the ordinance have a rational relationship to a legitimate government interest. *FM Properties*, 93 F.3d at 174. This ordinance has the required rational relationship. We cannot say Gulfport's fire flow ordinance is irrational or arbitrary.

## VI. *Procedural Due Process*

The "guarantee of fair procedure" requires that when the government invades a constitutionally protected interest in "life, liberty, or property," the government must provide due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). First, we ask whether a given interest "qualif[ies] as property interests for purposes of procedural due process." *See Bowlby v. City of Aberdeen*, 681 F.3d 215, 220 (5th Cir. 2012). Second, we ask "what process the State provided, and whether it was constitutionally adequate." *Id.* Because we find no recognized property right under state law, we do not discuss the procedure.

L&F argues that it has a property interest in water service and "should be treated as an existing water recipient . . . [,] not a mere applicant for new

16

service." Evidence allegedly supporting the claim is that Gulfport issued a will serve letter to Roundhill. L&F also argues that Roundhill was receiving water service as of January 2007 based on evidence that in January 2007, Southwest Water, a utility contractor with Gulfport, verified with the Gulfport Department of Public Works that water service was available for irrigation purposes. Subsequently, Southwest Water issued a work order and installed a yard meter, which would be used for landscaping or irrigation purposes.[3]

Gulfport responds that the will serve letter indicated by its own terms that Roundhill was merely eligible for water service. The letter identified multiple additional steps prior to final approval. Further, Gulfport argues that no yard meter was ever installed by Gulfport, L&F was never billed for any water, and even if a yard meter had been installed and irrigation water flowing, this water "would not qualify for potable use as water to a residence."

The district court determined that L&F was seeking "new, as opposed to continued, water service." We agree that the evidence did not create a dispute of material fact that L&F's project had ever been approved for or received the relevant water service. As noted, the will serve letter was a declaration of eligibility for service and not an indication that water service was being provided. Even if Roundhill had been connected to an irrigation water source, this does not establish that L&F was a recipient of the water service to which the fire flow requirements applied.

Protected property interests are those "that rise to the level of a 'legitimate claim of entitlement'" and not "mere expectations." *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980). Property interests are matters of state law, and they "stem from independent sources such as state

---

[3] As noted above, although L&F discusses Gulfport's unsatisfying production of records on this point, L&F does not appeal any of the district court's discovery rulings.

statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings." *Blackburn v. City of Marshall*, 42 F.3d 925, 936-37 (5th Cir. 1995). L&F has not pointed to Mississippi caselaw, statutes, or a local ordinance that creates a right to obtain water service. The district court also noted L&F's failure to identify any state authority on the question and relied on that omission to reject the existence of a right.

When determining state law in the absence of any controlling authority, "it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992). Mississippi has recognized a property interest in the continuation of existing electrical service. *Tucker v. Hinds Cnty.*, 558 So. 2d 869, 874 (Miss. 1990). The court relied on the fact that an "overwhelming majority of courts which have considered this question have found that continuance of electrical power is a property interest worthy of protection under the due process clause of the Fourteenth Amendment." *Id.* at 873. If there is similar substantial agreement that a property right exists in obtaining water service, not just continuing service in place, the agreement is a stranger to the parties' briefing. We will not brief the possibility for them. In fact, L&F has not argued that such a right exists, as it has understandably insisted that it has been denied a more recognizable right to maintain existing water service. We have already shown why we agree with the district court that there is no evidence of prior service.

We will not take Mississippi caselaw further than it has gone on the issue of property rights in utility service, as we do not see a basis to predict the state's highest court would recognize the right relevant here.

L&F has similarly failed to show that there was a mutually explicit understanding that Gulfport would provide water service based on either the will serve letter or the installation of the yard meter. Although L&F argues it

expected ultimately to receive approval for water service and expended financial resources in reliance on this expectation, "a unilateral expectation" is not enough to create a protected property interest. *Blackburn*, 42 F.3d at 936.

The failure to identify a protected property interest is fatal to L&F's procedural due process claim. *See Baldwin v. Daniels*, 250 F.3d 943, 946-47 (5th Cir. 2001).

## VII.   *Takings*

The Takings Clause of the Fifth Amendment, made applicable to states through the Fourteenth Amendment, is relevant when private property is taken either for private use or without just compensation. *Urban Developers LLC v. City of Jackson*, 468 F.3d 281, 292 (5th Cir. 2006). With respect to claims based on insufficient compensation, "no constitutional violation occurs until just compensation has been denied." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 n.13 (1985). Only when "the relevant governmental unit has reached a final decision" and "the plaintiff has sought compensation for the alleged taking" through applicable procedures is the claim ripe. *Urban Developers*, 468 F.3d at 292-93.

L&F acknowledges that Mississippi provides relief for inverse condemnation. *See* MISS. CONST. art. 3, § 17. L&F appealed the denial of service to the Harrison County Circuit Court, but the appeal was dismissed without prejudice because L&F had not exhausted its remedies. The record does not reflect further action by L&F with respect to exhaustion of municipal and state procedures. Therefore, "the relevant governmental unit" has not "reached a final decision," and L&F's appeal to this court is not ripe for adjudication. *See Urban Developers*, 468 F.3d at 292-93.

*VIII. Larry Mitrenga's Individual Claims*

Both L&F and Mitrenga individually filed claims in this suit. Mitrenga appeals the grant of summary judgment on his claims.

*A.    Mitrenga's Federal Law Claims*

The "irreducible constitutional minimum of standing" requires injury in fact, a causal connection between that injury and the complained of conduct, and a likelihood that the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Mitrenga asserts two injuries: economic and psychological.

Mitrenga's alleged economic injury stems from his personal guarantee of a loan to L&F. Although the bank has not seized Mitrenga's collateral for the loan, his assets remain encumbered by the personal guarantee. A stockholder in a corporation does not have standing to bring suit in his own name for injuries sustained by the corporation. *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 277 (5th Cir. 1997). This is true even where that individual is the sole shareholder of a corporation. *Id.* at 276-77. As an individual, Mitrenga has not been injured by Gulfport; rather Gulfport's actions have affected L&F as an LLC, which in turn has been unable to distribute funds to its creditors and shareholders, namely Mitrenga.

Mitrenga also asserts that he has suffered "mental anguish" as a result of Gulfport's discrimination. The only evidence Mitrenga has offered is a two-sentence doctor's letter stating: "Mr. Mitrenga's legal problems have caused a situational reactive disorder" and alluding to medication and more frequent doctor visits. This evidence is rather thin even to establish actual injury, but it is wholly inadequate to establish causation. An injury must be fairly traceable to the challenged actions of the defendant. *Lujan*, 504 U.S. at 560. Mitrenga's allusion to "this whole situation" and the doctor's to "legal problems"

No. 12-60597, Cons. w/ 12-60600, 12-60601

fails to establish the requisite nexus between Gulfport's underlying conduct and Mitrenga's mental anguish.

There is insufficient evidence to raise a genuine dispute of material fact that Mitrenga's mental anguish was caused by Gulfport's alleged underlying unlawful conduct, as apart from general litigation fatigue. On a different set of facts evidencing clear and egregious racial discrimination in the context of an eviction, this court "presumed . . . some degree of emotional distress." *Woods-Drake v. Lundy*, 667 F.2d 1198, 1203 (5th Cir. 1982). That atypical presumption does not apply in this case.

## B.     *Mitrenga's State Law Claims*

Mississippi law also establishes that an individual shareholder does not have standing to bring suit in his own name for injuries to a corporation. *Mathis v. ERA Franchise Sys., Inc.*, 25 So. 3d 298, 301 (Miss. 2009). On the express and implied contract claims, any contract to provide water service was between Gulfport and L&F, not Mitrenga individually.

As to the estoppel claim, Mitrenga asserts that he relied, individually, on the oral representations of City officials in making the decision to pledge personal assets in support of a loan to L&F. As discussed above, the equitable estoppel claim does not have merit as the unauthorized statements of an official do "not estop a municipality from acting in its governmental capacity." *Suggs v. Town of Caledonia*, 470 So. 2d 1055, 1057 (Miss. 1985).

AFFIRMED.